176 P.3d 560 (2008)
Ronald ENDICOTT and Donald Endicott, Respondents,
v.
Robert and Samantha SAUL, husband and wife, and Linda and Vernon Gabelein, husband and wife, Appellants. and
Emma Endicott, Appellant,
v.
Ronald Endicott and Donald Endicott, Respondents.
Nos. 58435-9-I, 58531-2-I.
Court of Appeals of Washington, Division 1.
February 4, 2008.
*563 John W. Demco, L'Nayim Shuman-Austin, Demco Law Firm PS, Matthew F. Davis, Attorney at Law, Seattle; WA, H. Clarke Harvey, Attorney at Law, Clinton, WA, for Appellants.
Carolyn Cliff, Attorney at Law, Langley, WA, for Respondents.
Michael Mert Waller, Zylstra Beeksma & Waller PLLC, Oak. Harbor, WA, for Guardian. Ad Litem.
H. Clarke Harvey, Attorney at Law, Clinton, WA, for Other Parties.
SCHINDLER, A.C.J.
¶ 1 Emma Endicott (Emma), Samantha and Robert Saul (the Sauls), and Linda and Vernon Gabelein (the Gabeleins) challenge the trial court's decision to establish a limited guardianship for Emma under the Guardianship Act, chapter 11.88 RCW, and to issue a protective order under the Abuse of Vulnerable. Adults Act (AVA), chapter 74.34 RCW. After a ten-day bench trial that took place over the course of three months, the trial court concluded clear, cogent, and convincing evidence established that Emma was at significant risk of personal and financial harm and that the Sauls and the Gabeleins unduly influenced and exploited Emma. Because substantial evidence supports the trial court's determination that Emma is incapacitated as to her person and as to her estate, that Emma is a vulnerable adult under the AVA, and that the Sauls and the Gabeleins exploited and unduly influenced Emma to sell her Whidbey Island view property to them for significantly below fair market value, we affirm.

*564 FACTS

¶ 2 Emma Endicott is an 80-year-old woman who has lived almost her entire life on Whidbey Island and was married to Orvel "Shorty" Endicott for 43 years. Emma has two sons from an earlier marriage, John Earl (Earl) Fisher and Robert (Bob) Fisher. Shorty and Emma had twin sons, Ronald (Ron) Endicott and Donald (Don) Endicott. Ron and Don lived with Emma and Shorty for most of their lives. Emma's son Earl lives with his family in Seattle. Bob and his spouse Sandy live nearby in the house built by Emma's father.
¶ 3 Emma and Shorty lived in a small neighborhood on Whidbey Island that has scenic views of Mutiny In 1947, Shorty inherited 24 acres of view property overlooking Mutiny Bay. In 1976, Emma inherited five acres and a one-third interest in her parents' house that is.located in the same general area.
¶ 4 During their 43-year marriage, Shorty managed and controlled all the finances and Emma and Shorty lived an extremely frugal life. Emma has never had a checking account or a credit card. Emma also never obtained a driver's license and, until shortly before the trial in this case, did not have a telephone.
¶ 5 Shorty died in 1998, leaving Emma the family home, the 24 acres of view and waterfront property, $114,000 in savings, and $556 per month from his pension benefits. Emma took over managing the finances and the property. After Shorty died, friends described Emma as devastated, lonely, and lost.
¶ 6 Initially, Emma relied on Ron and Don. But increasingly, Emma came to rely on Linda Gabelein and Samantha Saul. Linda is married to Vernon Gabelein. Emma's brother is married to Vernon Gabelein's sister. Linda has two daughters from a previous marriage, Samantha Saul and Dina Thompson. Samantha is married to Robert Saul, who grew up on Whidbey Island with Ron and Don. Linda Gabelein and Samantha Saul own homes in the same neighborhood as Emma and are both real estate agents with Windermere Real Estate (Windermere). Emma testified that Linda is like a daughter to her and that she worships Linda. Emma was also very close to Samantha. in June 2003, Emma executed a durable power of attorney, giving Samantha the authority to make all decisions on her behalf.
¶ 7 It is undisputed that Emma wants to live on her own in her house on Whidbey Island for the rest of her life. When Shorty died, Emma's childhood friend, Frank Robinson, offered to purchase a 445-foot beachfront portion of her property for $660,000. A long-time neighbor, Ray Lotto, later offered to buy most of Emma's property for $1.5 million and give Emma a life estate in her residence. Instead, in three separate real estate transactions, Emma sold the majority of her property to Dina Thompson and her spouse, to the Sauls, and to the Gabeleins. After the three real estate transactions with the Gabelein family members, Emma was left with 13.77 acres, but over a third of it was swamp and marshland.
¶ 8 In September 2001, Emma decided to sell the five acres she inherited from her parents after Earl and Bob Fisher were unable to agree on how to pay expenses for the prokrty.[1] After unsuccessfully attempting to sell the property by putting up a for sale sign, Emma asked Samantha, who had recently acquired her real estate license, to list the property for sale.
¶ 9 The assessed value for the five-acre parcel, was $82,326. Samantha originally listed the property for sale at $69,500. After two months, Samantha lowered the price to $64,500. When Dina Thompson and her spouse offered to buy the property for $52,000, Samantha acted as a dual agent for her sister and her brother-in-law and Emma. Emma relied on Samantha's advice and accepted the offer of $52,000. The court rejected Samantha's testimony that she did not suggest a price to her sister as not credible. Emma received $45,000 from the sale. Bob and Sandy Fisher were extremely upset that Emma sold the five acres and as a result were estranged from Emma for a number of years.
*565 ¶ 10 In February 2002, Emma sold another five acres of waterfront view property to Samantha and Robert Saul for $80,000. The 2001 assessed value of the property was $195,524. Samantha initially denied that she suggested the sales price of $80,000. But at trial Samantha admitted that she did. After purchasing the five acres, the Sauls invested $40,000 to $100,000 in improvements. When the Sauls applied for a home construction loan in July 2004, according to a bank appraisal, the five acre view property was valued at $400,000.
¶ 11 After the Sauls bought the property from Emma, Roy Lotto told Samantha he was willing to pay $1.5 million for the rest of Emma's property and would give Emma a life estate in her residence. Lotto said Samantha told him that she would be able to get the property for him. But in June 2004, Emma signed a purchase and sale agreement with Linda and Vernon Gabelein to sell five acres of prime view property next to the five acres Emma sold to the Sauls for $150,000. There is no dispute that the property was worth $324,000. The "Vacant Land Purchase and Sales Agreement" states that a five-acre parcel will "be created by Buyer paid short plat" with "all other expenses paid by Buyer" and a net purchase price of $150,000. The Addendum states that the "Seller may be selling the property substantially below market value as the property has not been exposed on the open market." The Addendum also states that because the buyer is a Windermere real estate agent, the agreement was "conditioned on review and approval by Sellers [sic] attorney." Because Emma's attorney was representing the Gabeleins in another real estate matter, Linda Gabelein arranged for Emma to meet with another attorney about the agreement. Emma's meeting with the attorney lasted approximately 20 to 30 minutes.
¶ 12 In September 2004, Emma and the Gabeleins signed another addendum to the Purchase and Sale Agreement that allowed the Gabeleins to assign their interest in the property to the Sauls and obtain a boundary line adjustment. It is undisputed that the purpose of the boundary line adjustment was to avoid the public notice requirement for a short plat and prevent Ron and Don from learning about the sale before it closed. According to an unchallenged finding, the Sauls and the Gabeleins acted with "deliberate secrecy" throughout this real estate transaction. Before signing the Addendum, Emma met with the same attorney again for about 20 to 30 minutes. Following the boundary line adjustment, Emma was left with a parcel of approximately nine acres, more than half of which is swamp and marshland. The sale closed on May 16, 2005. There is no dispute that, at closing, the property was worth $427,000.
¶ 13 During the evening of June 14, 2005, Emma fell down. Ron drove to Bob Fisher's house to call 911. When the paramedics arrived, Emma refused to go to the hospital. On the morning of June 16, Don found Emma on the floor and halfway under her bed. Ron and Don drove Emma to the hospital. Don said his mother's eyes were glazed, she was confused, and she did not know where she was. When they arrived at the hospital, the hospital personnel determined Emma was not competent to refuse hospitalization. The court concluded it was not likely that Ron and Don would have called 911 if Emma had not fallen, as they claimed. The trial court also concluded that Emma's memory was suspect and "she is suggestible to the memories of others, especially as to what happened the night before she went in to the hospital in June 2005."
¶ 14 At some point, Samantha notified the hospital that she had the power of attorney for Emma. Samantha also told the hospital social worker that Emma said Ron and Don hit her and that was why she was in the hospital. Samantha was present when the social worker interviewed Emma. Emma told the social worker that she did not remember why she was in the hospital, but that Ron and Don yelled at her a lot, that they were controlling, and they would not let her watch television. That same day, Emma filed a petition for a domestic violence protection order against Ron and Don. The court entered a temporary restraining order requiring *566 Ron and Don to move out of the house.[2] When Emma was released from the hospital, she went to live with Bob and Sandy Fisher. Emma lived with the Fishers until December.
¶ 15 On July 11, 2005, Ron and Don filed a petition to establish a guardianship for Emma and for her estate, to obtain a protective order for Emma as a vulnerable adult under the AVA, and to rescind the May 2005 real estate transaction with the Sauls and the Gabeleins. Ron and Don alleged that Emma was incapacitated as to her person and as to her estate, that the. Sauls and the Gabeleins exerted undue influence over Emma, and that the Sauls and Gabeleins financially exploited her.
¶ 16 Prior to trial, Emma, the Sauls, and the Gabeleins filed a motion to bifurcate the request to rescind the May 2005 real estate transaction. The Sauls and the Gabeleins also filed a motion to exclude evidence relating to alleged undue influence concerning the 2005 real estate transaction. The court granted the motion to bifurcate the request to rescind the 2005 real estate transaction, but denied the motion to, exclude testimony about undue influence related to the transaction.
¶ 17 A ten-day bench trial began in December 2005 and concluded in March 2006. During the course of the trial, the court heard testimony from 36 witnesses and admitted more than 75 exhibits. At the conclusion of the trial, the court issued a 55-page written opinion consisting of 94 separate findings of fact and 26 conclusions of law. The court concluded that Emma was incapacitated as to her person and as to her estate, that Samantha and Linda had a confidential and fiduciary relationship with Emma, that Emma was a vulnerable adult under the AVA, and that the Sauls and Gabeleins unduly influenced and financially exploited Emma. The court appointed. Emma's son Earl as a limited guardian with the "goal of allowing Emma to live in her house for as long as possible"[3] and entered a protective order under the AVA prohibiting the Sauls and the Gabeleins from transferring or encumbering the property Emma sold in May 2005.

ANALYSIS
¶ 18 On appeal, Emma, Samantha and Robert Saul, and Linda and Vernon Gabelein challenge the trial court's determination that Emma is incapacitated as to her person and as to her estate. Emma, the Sauls, and the Gabeleins also contend the trial court erred in shifting the burden to Samantha and Linda to prove lack of undue influence and finding Emma was a vulnerable adult under the AVA.
Standard of Review
¶ 19 We review the trial court's decision following a bench trial to determine whether the findings are supported by substantial evidence and whether those findings support the conclusions of law. Dorsey v. King County, 51 Wash.App. 664, 668-69, 754 P.2d 1255 (1988). Substantial evidence is the quantum of evidence sufficient to persuade a rational fair-minded person the premise is true. Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wash.2d 169, 176, 4 P.3d 123 (2000). In determining the sufficiency of evidence, an appellate court need only consider evidence favorable to the prevailing party. Bland v. Mentor, 63 Wash.2d 150, 155, 385 P.2d 727 (1963). In evaluating the persuasiveness of the evidence, and the credibility of witnesses, we must defer to the trier of fact. Burnside v. Simpson Paper Co., 123 Wash.2d 93, 108, 864 P.2d 937 (1994). "[C]redibility determinations are solely for the trier of fact [and] cannot be reviewed on appeal." Morse v. Antonellis, 149 Wash.2d 572, 574, 70 P.3d 125 (2003). Unchallenged findings of fact are also verities on appeal. In re Estate of Jones, 152 Wash.2d 1, 8, 93 P.3d 147 (2004); RAP 10.3(g). We review questions of law de novo. Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wash.2d 873, 879-880, 73 P.3d 369 (2003).
*567 ¶ 20 The clear, cogent and convincing burden of proof contains two components: (1) the amount of evidence necessary to submit the question to the trier of fact or the burden of production, which is met by substantial evidence; and (2) the burden of persuasion. As to the burden of persuasion, the trier of fact, not the appellate court, must be persuaded that the fact in issue is "highly probable." Colonial Imports, Inc. v. Carlton Northwest, Inc., 121 Wash.2d 726, 734-735, 853 P.2d 913 (1993),
¶ 21 In determining whether the evidence meets the "clear, cogent and convincing" standard of persuasion, the trial court must make credibility determinations and weigh and evaluate the evidence. Bland, 63 Wash.2d at 154, 385 P.2d 727.
What constitutes clear, cogent, and convincing proof necessarily depends upon the character and, extent of the evidence considered, viewed in connection with the surrounding facts and circumstances. Whether the evidence in a given case meets the standard of persuasion, designated as clear, cogent, and convincing, necessarily requires a process of weighing, comparing, testing, and evaluatinga function best performed by the trier of the fact, who usually has the advantage of actually hearing and seeing the parties and the witnesses, and whose right and duty it is to observe their attitude and demeanor.
Bland, 68 Wash.2d at 154, 385 P.2d 727.
Thus, the appellate court's role is limited to determining whether substantial evidence supports the trial court's findings of fact. Bland, 63 Wash.2d at 154, 385 P.2d 727. It is for the trial court, and not this reviewing court, to determine whether the evidence in a given case meets the standard of persuasion designated as "clear, cogent and convincing." Id.
Limited Guardianship
¶ 22 Emma, the Sauls, and the Gabeleins challenge the trial court's conclusion that Emma is incapacitated as to her person and as to her estate. The standard of proof in a guardianship proceeding is clear, cogent, and convincing evidence. RCW 11.88.045(3). In determining incapacity as to the person, the court must determine whether the individual is at significant risk, of personal harm "based upon a demonstrated inability to adequately provide for nutrition, health, housing, or physical safety." RCW 11.88.010(1)(a). In determining incapacity as to the estate, the court must decide if there is a significant risk of financial harm based upon a demonstrated inability "to adequately manage property or financial affairs." RCW 11.88.010(1)(b). The guardianship statute authorizes the superior court to appoint a guardian for an incapacitated person.
¶ 23 RCW 11.88.010 provides in pertinent part:
(1) The superior court of each county shall have power to appoint guardians for the persons and/or estates of incapacitated persons, and guardians for the estates of nonresidents of the state who have, property in the county needing care and atten tion.
(a) For purposes of this chapter, a person may be deemed incapacitated as to person when the superior court determines the individual has a significant risk of personal harm based upon a demonstrated inability to adequately provide for nutrition, health, housing, or physical safety.
(b) For purposes of this chapter, a person may be deemed incapacitated as to the person's estate when the superior court determines the individual is at significant risk of financial harm based upon a demonstrated inability to adequately manage property or financial affairs.
¶ 24. Under RCW 11.88.010(1)(c), the determination of incapacity "is a legal not a medical decision, based upon a demonstration of management insufficiencies over time in the area of person or estate. Age, eccentricity, poverty, or medical diagnosis alone shall not be sufficient to justify a finding of incapacity." In making this determination, the trial court considers evidence from all sources, not just experts. In re Guardianship of Stamm v. Crowley, 121 Wash.App. 830, 841, 91 P.3d 126 (2004).
¶ 25 Here, the trial court concluded clear, cogent, and convincing evidence established *568 that Emma is at a significant risk of personal harm "based on a demonstrated inability to adequately provide for her nutrition, health, or physical safety."
The court concludes, based on clear, cogent, and convincing evidence, that Emma is at significant risk of personal harm based on a demonstrated inability to adequately provide for her nutrition, health, or. physical safety. In the court's opinion, the professionals who have concluded otherwise have not had all of the information that was provided to this court during the trial, having based their opinions primarily on short interviews done months ago.
¶ 26 Substantial evidence supports the trial court's conclusion that Emma is incapacitated as to her person. The trial court found that the unbiased testimony of Emma's neighbors, Don Gulliford and Janet Lotto, was more credible than the testimony of other witnesses. According to the unchallenged testimony of Don Gulliford, he found Emma wandering along a roadside ditch in the summer of 2003, holding a toothbrush. When he stopped to help her, Emma did not appear to know where she was going and "seemed confused and [in need] of assistance." When Janet Lotto brought Emma food in November 2004 and in December 2004, Emma appeared confused and told Lotto to whisper "because she did not want Vernon Gabelein to know about the food." And according to the testimony of other witnesses, there were multiple occasions in 2005 when Emma did not recognize people she had known for decades. In addition, the court relied on Frank Robinson's undisputed testimony about Emma. Robinson was a friend of Emma's since childhood and regularly visited her, According to Robinson, in the summer of 2005 and at trial, Emma did not recognize him and acted agitated and confused when he spoke to her.
¶ 27 It is also undisputed, that when Emma was hospitalized in June 2005, the hospital personnel determined she was not competent to refuse medical care because she "was disoriented" and confused. Before Emma was admitted to the hospital in 2005, Emma had not been to a doctor or had any medical care for over thirty years.
¶ 28 There is also no dispute that "Emma does not cook, and relies on others for her meals." And on the occasions when Emma cooked, she burned or undercooked the food or cooked spoiled meat. Emma would also turn the stove on and sometimes forget to turn it off and often dropped her lit cigarettes on the floor without noticing. In addition, the trial court's finding that Emma continued to go through "the garbage at the county boat ramp, even after being advised that it was dangerous because needles from illegal drug use had been discarded there" is unchallenged.
¶ 29 The court considered but expressly rejected the opinion of the psychologist, Dr. Janice Edwards, that Emma did not need a guardian, because the opinion was based on a "short interview[] done months ago."
The court has struggled with these opinions because the court has respect for . . . these professionals. But . . . Dr. Edwards' impressions reflect a two-hour visit at the end of September of 2005.[Her] impressions are widely divergent from what the court observed of Emma over a period from December of 2005 through March 2, [2006], through ten days of trial. Even the guardian ad litem, who testified after Emma, acknowledged that if she were looking at Emma solely based on Emma's testimony in court, that she too might have doubts as to whether Emma needed a guardian.
. . .
The court is also mindful that the professionals based their opinions on information gathered when Emma was staying with Bob and Sandy Fisher. But the court concludes that things have changed since Emma moved back into her home alone on December 1, 2005. . . . The court concludes that Emma appears to have gone downhill since she started living alone on December 1, 2005.
In evaluating Dr. Edwards' opinion, the trial court expressly "credit[ed] the information elicited on cross-examination."
Dr. Edwards is a forensic psychologist who has done over 100 guardianship evaluations. However, the court credits the information *569 elicited during her cross-examination: that she was not aware of much of the evidence provided to the court in this trial. For example, Dr. Edwards was not aware . . . that Emma had not been to a doctor in over 30 years until she was hospitalized in June of 2005, that Emma had no preventative checkups or any well health care until the guardianship petition was filed, that Emma had refused emergency medical care, or that Emma was considered not competent to refuse hospitalization when she was admitted to the hospital in June of 2005.
¶ 30 During cross examination, the GAL also admitted that before her investigation was complete and before talking to "Earl Fisher, Emma's oldest son and the proposed guardian; Janet Lotto[; or] Emma's [siblings]," she had already decided that she would not recommend a guardianship.
¶ 31 Emma's trial testimony also supports the trial court's conclusion of incapacity. For instance, Emma's description about what she said when Janet Lotto brought food to her was incoherent:
Q. And you were in court when Janet Lotto described bringing food to you after Thanksgiving and Christmas?
A. Yes.
Q. And you told her to whisper and not to tell Vernon about it. Do you remember Janet saying that?
A. What? No. I know what that was all about. I don't know if I should tell it or not. But she got scared one night and she come up and I should have went with her. I told her afterwards, too, I said, Janet, should have went with you. Because it was not at night, it was in sort of the afternoon.
And Emma often had difficulty answering simple questions during the trial. For example, when asked "[h]ow long have you had that microwave?" she replied "[s]ince I've beenand you should see the house. They're painting the house inside. Inside. Linda and Sandy, my daughter-in-law, well, Linda, there'sand we were talking about it the other day, we're going to finish painting the inside." When asked "[w]hat did you believe that the property was worth when you agreed to sell it?" Emma replied "No, I sold it because . . . there was so much junk up there." Asked about the property that she sold for $150,000 that was worth $427,000, "Emma scoffed and said, `It's just sand'."
¶ 32 The court found Emma was "frail, confused, unsteady, disoriented, childlike, and oftentimes belligerent. . . ." According to the court, while it is not unusual for a person of Emma's age to be forgetful, "Emma's forgetfulness had another element to it. It is not that Emma could norremember something; it is that Emma refused to believe certain things had happened at all. On other occasions, Emma asserted certain information as if it was the truth when she clearly had no memory of the event." The trial court also clearly rejected the argument that an infection in February caused Emma's sometimes incoherent testimony.[4]
¶ 33 Emma, the Sauls, and the Gabeleins rely on Elston v. McGlauflin, 79 Wash. 355, 140 P. 396 (1914), to argue the trial court impermissibly relied on its own observations of Emma's behavior at trial as evidence of incapacity in violation of ER 605. Emma, the Sauls, and the Gabeleins specifically challenge findings of' fact 76, 92, and 93, claiming they were unable to challenge the court's *570 observations that were not made part of the record.
¶ 34 Finding of fact 76 states:
If Emma did not agree with the testimony from other witnesses, she would make faces of astonishment or bafflement, indicating clearly her disagreement with the testimony. She continued to talk in court, at times so loudly that she would have to be reminded by the court to be quiet. In December of 2005, during the testimony of her sister-in-law, Ruth Gabelein Ohm, Emma laughed, smiled, talked, and looked around as if she was at a social gathering. Emma's attorney frequently had to tell her to be quiet. The court understands that a guardianship proceeding is a difficult time for anyone. But Emma's behavior in court was dramatically different from anyone else that the court has observed in ten years on the bench.
¶ 35 Finding of fact 92 states:
As Ron was testifying, Emma was saying to her attorney, loudly enough for anyone in the courtroom to hear, "That's not true! That's not true!"
¶ 36 Finding of fact 93 states:
In reaching its decision in this case, the court has carefully considered the opinions of the professionals described above: i.e., that Emma is fine. But it is the court's strong impression, and the court finds, that Emma is not, in fact, fine but rather that she is incapacitated. Emma has not appeared to be fine to this court, or to many people who are part of her family or otherwise knowledgeable about her and who have nothing to gain from their testimony about their concerns.
¶ 37 Under ER 605 "[t]he judge presiding at the trial may not testify in that trial as a witness." In Elston, during the trial in an action to recover damages allegedly caused by negligent construction of an apartment building on a steep slope, the judge visited the site without the knowledge of the parties or counsel. Elston, 79 Wash. at 357, 140 P. 396. On appeal, the court held that the trial court's independent investigation impermissibly denied the parties a fair trial. Elston, 79 Wash. at 359, 140 P. 396. "The court unwittingly became a witness in the case and in some degree, at least, based his judgment upon his own independent experience and preconceived opinion." Id. Here, unlike in Elston, the trial judge did not conduct an independent investigation or make a decision based upon independent experience and preconceived opinions. And in deciding the incapacity and competency of a witness, the trial court is entitled to draw on its observations of the witness. See Day v. Santorsola, 118 Wash.App. 746, 765, 76 P.3d 1190 (2003); State v. Avila, 78 Wash.App. 731, 735, 899 P.2d 11 (1995).
¶ 38 The record also shows that on numerous occasions, the judge noted Emma's inappropriate courtroom behavior. For example, the court admonished Emma "to not make comments out loud during" the testimony of other witnesses. And as finding of fact 93 makes clear, the trial court considered but expressly rejected the expert opinions offered and primarily relied on the trial testimony of disinterested witnesses such as Don Gulliford, Janet Lotto, and Frank Robinson in reaching the conclusion that Emma is at significant risk of personal harm "based on a demonstrated inability to adequately provide for her nutrition, health, or physical safety."[5]
¶ 39 Substantial evidence also supports the trial court's conclusion that "Emma is at significant risk of financial harm based upon a demonstrated inability to adequately manage property or financial affairs." There is no dispute that Emma wishes to remain in her home as long as possible, but that "Emma is not able to protect her resources to meet her future needs" and her "uni[n]formed decisions will have an enormous impact on her" ability to do so. The parties also do not challenge the finding that Emma "has absolutely no idea of property values or financial planning" or that after months of litigation about the value of the properties she sold "Emma is unaware of the market value of the property that she sold *571 and does not even care." Although Emma insisted "I know what I sold," when she finally understood that she was being asked how much the property was worth, she admitted "I don't know. I don't know all that. Jeepers." Emma also testified that "I forget how many acres I've got left. I had 24 . . . but I don't have that much now. I don't know what all I have."
¶ 40 In addition, the evidence establishes Emma has difficulty paying bills and is unaware of her finances.[6] Emma relies on the bank tellers to make entries in her check register and could not account for the withdrawal of money. Emma did not recognize entries in her checkbook and could not explain the withdrawals from her account in 2004. And according to one of the court's unchallenged findings, "(iln addition to having unaccounted withdrawals from her savings, Emma has little understanding of `investments,' which also leaves her vulnerable to others."
¶ 41 Because substantial evidence supports the trial court's findings, we conclude the court did not err in appointing a limited guardianship for Emma to allow her to meet her medical and day-to-day needs and assist her in managing her finances and property.
Abuse of Vulnerable Adults Act Protection Order
¶ 42 Emma, the Sauls, and the Gabeleins also contend that the trial court erred in concluding Emma was a vulnerable adult and entering a protective order under the Abuse of Vulnerable Adults Act (AVA), chapter 74.34 RCW. Relying on former RCW 74.34.110(2),[7] Emma, the Sauls, and the Gabeleins assert that the court had to find by clear, cogent and convincing evidence that Emma was a vulnerable adult when she signed the purchase and sale agreement with the Gabeleins in 2004 and the evidence does not support finding Emma was a vulnerable adult in 2004.[8]
¶ 43 Statutory interpretation is a question of law we review de novo. Western Telepage, Inc. v. City of Tacoma, 140 Wash.2d 599, 607, 998 P.2d 884 (2000). The court's primary goal is "to ascertain and give effect to legislative intent." State v. Pac. Health Ctr., Inc., 135 Wash.App. 149, 158-59, 143 P.3d 618 (2006). Legislative intent is determined primarily from the statutory language, viewed "in the context of the overall legislative scheme." Collection Servs. v. McConnachie, 106 Wash.App. 738, 741, 24 P.3d 1112 (2001). If the statute's meaning is plain on its face, we give effect to that plain meaning. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wash.2d 1, 9-10, 43 P.3d 4 (2002).
¶ 44 The stated purpose of the AVA is to protect vulnerable adults from abuse, financial exploitation, and neglect. RCW 74.34.110. Under the AVA, the court shall conduct a hearing on a petition for an order of protection and can enter an order to protect the vulnerable adult from exploitation, "not to exceed one year." Former ROW 74.34.130.
¶ 45 Former ROW 74.34.110(2) provides that:
A petition shall allege that the petitioner is a vulnerable adult and that the petitioner has been abandoned, abused, financially exploited, or neglected, or is threatened with abandonment, abuse, financial exploitation, or neglect by respondent.
¶ 46 A "vulnerable adult" is defined as a person Islixty years of age or older who has the functional, mental, or physical inability to care for himself or herself' or is "[f]ound incapacitated under chapter 11.88 ROW. . . ." Former ROW 74.34.020(13). The AVA establishes *572 an action for the protection of vulnerable adults in cases of "abandonment, abuse, financial exploitation, or neglect. . . ." The AVA definition of "abuse includes exploitation of a vulnerable adult. . . ." Former RCW 74.34.020(2). "[E]xploitation" is defined as "an act of forcing, compelling, or exerting undue influence over a vulnerable adult causing the vulnerable adult to act in a way that is inconsistent with relevant past behavior. . . ." Former RCW 74.34.020(2)(d). According to the statutory definition of "exploitation," exploitation can only occur when the adult is vulnerable. Under the plain language of the AVA, we conclude the court must find an individual is a vulnerable adult at the time of the alleged exploitation.
¶ 47 Relying on the opinion of Dr. Edwards and the fact that the GAL did not recommend a guardianship, Emma, the Sauls, and the Gabeleins contend the evidence does not support the trial court's conclusion that Emma was a vulnerable adult under the AVA in 2004 when she signed the purchase and sale agreement.
Since her husband died in 1998, Emnia has been vulnerable to others, who have taken advantage of her desire to please those 'persons she perceives as being her friends or looking out for her best interests, such as Linda Gabelein and Samantha Saul. Emma has sold property to members of the Gabelein family for a fraction of its Value jeopardizing her ability to remain in her home for the remainder of her life.
¶ 48 The testimony of Dr. Edwards and the GAL about Emma's mental capacity "presents one source of information among many, credibility is the province of the judge, and . . . the judge can cast a skeptical eye when called for." Stamm, 121 Wash.App. at 841, 91 P.3d 126. And the court rejected the opinion of Dr. Edwards as based on spending very limited time with Emma while she was being taken care of by and living with Bob and Sandy Fisher.
¶ 49 In addition, Emma, the Sauls, and the Gabeleins argue that Emma was not a vulnerable adult under the AVA because the GAL "concluded Emma was not an exploited vulnerable adult." They mischaracterize the GAL's testimony. While the GAL testified that she did not believe the Gabeleins had "purposely done something to hurt" Emma, the GAL's report states that "[n]one of this means that Emma has not been unduly influenced."
¶ 50 Evidence concerning Emma's incapacity under chapter 11.88 RCW also supports the trial court's conclusion that Emma was a vulnerable adult when she entered into the purchase and sale agreement with the Gabeleins in 2004.[9] For jnstance, in 2003, the same year that Don Gulliford found Emma wandering along a ditch, disoriented and confused, Emma gave Samantha Saul a durable power attorney apparently without realizing it was effective immediately. Emma told Dr. Edwards that "she had made a power of attorney over to Samantha Saul [that] . . . is not in effect, but will become active if she is unable to handle her own affairs."[10] And as previously described, it is undisputed that by 2004 Emma could not independently manage her finances or take care of herself. And Ron testified that he stopped accepting out-of-town jobs in 2004 because his brother could no longer care for Emma by himself.
¶ 51 On this record, substantial evidence supports the trial court's conclusion that Emma was a vulnerable adult in 2004 under the AVA when she sold the property to the Gabeleins.
¶ 52 Emma, the Sauls, and the Gabeleins also challenge the trial court's conclusion that the Sauls and the Gabeleins exploited Emma by exerting undue influence over her by inducing her to sell her property to them in 2004 at a price far below the market value. They argue that Emma was not exploited because she met with an attorney about the 2004 purchase and sale agreement. *573 But the trial court's unchallenged finding that Emma had "absolutely no idea of property values" supports the court's conclusion that Emma was exploited despite meeting with an attorney. And the unchallenged finding that Emma did not understand the effect of selling her property on her ability to live independently in her home for the rest of her life also supports the conclusion that Emma was exploited, despite meeting with an attorney.
¶ 53 Next, Emma, the Sauls, and the Gabeleins contend the property sale was not a gift and the trial court erred in relying on White v. White, 33 Wash.App. 364, 655 P.2d 1173 (1982), to shift the burden to the Sauls and Gabeleins to prove lack of undue influence. The trial court ruled that Emma made a gift to the Sauls and the Gabeleins. "By selling her property as far below its market value as she has, Emma has, in essence, made gifts to the Sauls and the Gabeleins of substantial value, based on the difference between the sales price and the fair market value of each property. . . ."
¶ 54 As a general rule, the party seeking to set aside an inter vivos gift has the burden of showing the gift is invalid. Lewis v. Estate of Lewis, 45 Wash.App. 387, 388, 725 P.2d 644 (1986). But if the recipient has a confidential or fiduciary relationship with the donor, the burden shifts to the donee to prove "a gift was intended and not the product of undue influence." Lewis, 45 Wash.App. at 389, 725 P.2d 644; White, 33 Wash.App. at 368, 655 P.2d 1173.[11] "[E]vidence to sustain the gift between such persons must show that the gift was made freely, voluntarily, and with a full understanding of the facts . . . If the judicial mind is left in doubt or uncertainty as to exactly what the status of the transaction was, the donee must be deemed to have failed in the discharge of his burden and the claim of gift must be rejected." McCutcheon v. Brownfield, 2 Wash.App. 348, 356, 467 P.2d 868 (1970). The donee's burden of proof is clear, cogent, and convincing evidence. Pedersen v. Bibioff, 64 Wash.App. 710, 720, 828 P.2d 1113 (1992). Whether a legal fiduciary relationship exists is a question of law, which we review de novo. S.H.C. v. Lu, 113 Wash. App. 511, 524, 54 P.3d 174 (2002). Whether a confidential relationship exists is a question of fact. McCutcheon v. Brownfield, 2 Wash. App. 348, 356-57, 467 P.2d 868 (1970).
The Sauls and the Gabeleins dispute the trial court's conclusion that Samantha and Linda had a confidential or fiduciary relationship with Emma. "A confidential or fiduciary relationship between two persons may exist either [in law] because of the nature of the relationship between the parties . . . or the confidential relationship between persons involved may exist in fact." McCutcheon, 2 Wash.App. at 356-57, 467 P.2d 868. A confidential relationship exists when one person has gained the confidence' of the other and "purports to act or advise with the other's interest in mind." McCutcheon, 2 Wash.App. at 357, 467 P.2d 868.
¶ 56 The power of attorney Emma executed in June 2003 that gives Samantha "all of the powers of an absolute owner over [Emma's] assets and liabilities," including the authority to "[l]ease, sell, release, convey, exchange, mortgage, and release any mortgage on land, and any interest therein," establishes Samantha had a legal fiduciary relationship with Emma. While Emma, the Sauls, and the Gabeleins argue that Samantha's fiduciary role is irrelevant because she did not purchase the property in. 2004, the trial court's finding that her role was critical to the sale is unchallenged"[t]he Gabelein transaction would not have occurred without the Sauls' participation in a boundary line adjustment."
¶ 57 Substantial evidence also supports the court's findings that both Samantha and. Linda had a confidential or fiduciary relationship with Emma and exerted undue influence over her. It is undisputed that Samantha was involved in all three real estate transactions and, for each transaction, "Emma thought the property was worth a substantial amount *574 less than it was." Samantha gained Emma's confidence and purported to act in Emma's best interest as her friend, giving advice based on her superior knowledge. For example, Samantha testified that in the 2002 sale, she rejected Emma's proposed price of $52,000 as "too low," then showed Emma "comparable" property sales records demonstrating that $80,000 was a fair market value.[12] But the trial court found $80,000 was a "bargain" price and below fair market value.[13]
¶ 58 Linda also gained Emma's confidence and purported to advise Emma as her friend and act with Emma's best interests in mind, using her superior knowledge. In the 2004 property transaction, Linda rejected Emma's price as "too low" but told Emma that comparable sales data showed $150,000 was "in the ballpark" of a reasonable price. Yet on appeal, there is no dispute that the property is "some of the best view property on Whidbey Island" and was worth $324,000 in June 2004 and $427,000 when the sale closed in May 2005.[14] It is also undisputed that Linda was the listing agent for a house on a small lot in the same neighborhood that sold for only $150,000 around the same time. The trial court noted that this sale also showed that Linda's claim that $150,000 was "in the ballpark" was not credible.
¶ 59 Citing conclusions of law 10 and 17, the Sauls and the Gabeleins also claim the court erred by imposing a fiduciary duty on Samantha and Linda contrary to the laws governing real estate agents.[15] Conclusion of law 10 states:
Given Emma's age, her lack of sophistication in financial matters, and her almost childlike trust in Samantha and Linda, each of them should have insisted upon getting appraisals and paying fair market value in purchasing property from Emma.
¶ 60 Conclusion of law 17 states:
Samantha had an obligation to advise Emma about the fair market value of the property that Samantha purchased from her before the purchase. Linda had an obligation to advise Emma about the fair market value of the property that Linda purchased from her before the purchase.
¶ 61 It is undisputed that neither Linda nor Samantha acted as Emma's real estate agent for the 2004 real estate transaction. In context, it is clear that the crux of conclusions of law 10 and 17 is not the role Samantha and Linda played as real estate agents but rather their responsibility, because of their close relationship with Emma and Emma's unequivocal trust in and reliance on them, to use their superior knowledge in Emma's best interest.
¶ 62 Because the trial court correctly concluded that Samantha and Linda had a confidential relationship with Emma, as a matter of law they have the burden to prove a gift was not a result of undue influence. In a number of cases, Washington courts have held that below-market sales are gifts. In the Matter of the Estate of .McLeod, 105 Wash.2d 809, 814, 719 P.2d 88 (1986) (in the context of the inheritance tax, "the excess of the fair market value above the [amount paid] was . . . a gift"); Glorfield v. Glorfield, 27 Wash.App. 358, 359, 617 P.2d 1051 (1980) (for community property purposes in a dissolution, "sales which were substantially below fair market value" were characterized as gifts). Emma, the Sauls, and the Gabeleins cite no case to the contrary.
¶ 63 The only authority Emma, the Sauls, and the Gabeleins cite to support their argument *575 that the 2004 transaction was not a gift is the introduction to the Washington Administrative Code (WAC) provision regulating taxation of real property transfers. WAC 458-61A-201(1) provides:
Generally, a gift of real property is not a sale, and is not subject to the real estate excise tax. A gift of real property is a transfer for which there is no consideration given in return for granting an interest in the property. If consideration is given in return for the interest granted, then the transfer is not a gift, but a sale, and it is subject to the real estate excise tax to the extent of the consideration received.
But a later example in WAC 458-61201(6)(b) explains that the value transferred in excess of the consideration received is a gift:
(ii) Keith and Jean, as joint owners, convey their residence valued at $200,000 to Jean as her sole property. There is no underlying debt on the property. In exchange for Keith's one-half interest in the property, Jean gives Keith $10,000. Keith has made a gift of $90,000 in equity, and received consideration of $10,000. Real estate excise tax is due on the $10,000.
¶ 64 We conclude the trial court did not err in concluding that Emma's sale for well below market value was a gift and in shifting the burden to the Sauls and the Gabeleins to prove undue influence.[16]
¶ 65 According to one of the court's unchallenged findings of fact, "Emma did not have any' idea of the value of the property that she sold to the Gabeleins and still does not." Emma's lack of expertise in real estate and financial matters is also undisputed. Because Emma never had a full understanding of the facts, the claim of gift must be rejected.
¶ 66 Even if the Sauls and Gabeleins did not have the burden to prove undue influence, substantial evidence supports the court's conclusion that clear, cogent, and convincing evidence establishes "Emma . . . has been exploited by the Sauls and the Gabeleins." Undue influence can exist "when highly unreasonable consideration is coupled with other inequitable incidents." Lewis v. Estate of Lewis, 45 Wash.App. 387, 391, 725 P.2d 644 (1986). "Even though no directly false statements are made, if there appears to be a studied effort to produce a false impression upon the mind of the party from whom land is being purchased, this, together with inadequacy of price, will be sufficient to authorize relief." Downing v. State, 9 Wash.2d 685, 689-90, 115 P.2d 972 (1941).
¶ 67 Here, Samantha and Linda convinced Emma that they were looking out for her best interests by telling Emma her price was "too low," then suggesting prices that were still egregiously low. Emma was also given misleading "comparable" property sales to lead her to believe that the bargain sale prices were reasonably close to market value.
¶ 68 After the first sale to the Thompsons, the Sauls asked Emma to sell them property.[17] While Emma offered to sell the property to the Sauls for $52,000, they agreed to buy it for $80,000. Before trial, Samantha took the position that Don or Emma suggested $80,000 as the purchase price. But at trial, Samantha admitted that she proposed $80,000. However, she claimed that $80,000 was "in the range of what was reasonable" for five acres with a marine-mountain view, despite the undisputed evidence that the property was assessed at $195,524 the previous year. And when the Sauls applied for a loan two years later, the bank appraisal valued the property at $400,000.
¶ 69 A few months after the sale to the Sauls, Linda Gabelein testified that she approached *576 Emma about buying another fiveacre parcel. During the transaction, Linda also purported to act in Emma's best interest by insisting on paying more than Emma initially offered but then agreeing to a price that was still far below market value. Sometime after the 2004 purchase and sale agreement, an addendum was executed. Linda brought the boundary line adjustment paperwork to Emma to sign. Emma signed at least two versions, including one that lacked a legal description or a map. In the boundary line adjustment that was finally approved, all of the less-desirable marsh and swampland was excluded from the five acres the Gabeleins purchased. The Sauls and the Gabeleins also took steps to ensure Ron and Don did not learn about the 2004 real estate transaction until after closing. Linda Gabelein told a fellow real estate agent that the sale was "hush-hush" and "a really good deal."
¶ 70 There was also testimony that both the Sauls and the Gabeleins told others they were able to influence Emma. According to one unchallenged finding, Samantha told Ray Lotto that "she was working on Emma, by being nice to her and taking her on trips to Costco, so that she could get a listing on Emma's property that Lotto wanted to buy." Ray Lotto testified that Samantha thought "given enough time [she would] be able to get this property for" him. Emma's daughter-in-law Sandy Fisher testified that Vernon Gabelein told her that he "could talk Emma into giving Bob Fisher and Earl Fisher . . . her remaining five-acre parcel of property. . . ."[18] And according to the GAL, Linda and Samantha could "get Ms. Endicott to change her mind. . . ." The unchallenged findings also show that Samantha's influence over Emma extended beyond real estate. For instance, when Ron and Don questioned "the prudence of Emma's purchase of a 30-year annuity in 2002, she would not believe that their questions were valid until she had Samantha Saul check out the situation." And it is undisputed that during Emma's testimony, she "volunteered, `[i]f Sam told you that, that's the truth.' . . . As Emma said, if Samantha, Saul says it, that's the truth for Emma."
¶ 71 Substantial evidence also supports the trial court's, finding that the undue influence of the Sauls and the Gabeleins over Emma caused her "to act in a way that is inconsistent with relevant past behavior."[19] Many witnesses testified that Emma was extremely frugal. Emma used to dig through trash to find can labels she could turn in for fifty cents or a dollar. Emma has always worn secondhand clothes she got for free. She did not replace her 50-year-old broken dentures because she did not want to spend the money. Before Shorty's death, the couple had never conveyed any property except when Emma gave her favorite sister Annie the one-third interest she inherited in their parent's home.[20]
¶ 72 On this record, we conclude the trial court did not err in ruling Emma is a vulnerable adult under the AVA and issuing a protective order preventing the Sauls and the Gabeleins from transferring or encumbering the property she sold to them in 2004.

CONCLUSION
¶ 73 We affirm the trial court's decision establishing a limited guardianship for Emma and issuing an order of protection for her as a vulnerable adult under the AVA. Substantial evidence supports finding that Emma is incapacitated as to her person and as to her estate, and that the Sauls and the Gabeleins unduly influenced and exploited *577 Emma. As the prevailing parties on appeal, upon compliance with RAP 18.1, Ron and Don are entitled to attorney fees on appeal under RCW 11.96A.150 and RCW 74.34,130.[21]
WE CONCUR: APPELWICK, C.J., and BECKER, J.
NOTES
[1] There was an understanding in the family that Earl and Bob would inherit Emma's five acres.
[2] The court later entered an order of protection against Don because of an unrelated incident a year earlier.
[3] The court selected Earl Fisher because he would act in his mother's best interest, he was impartial, and he was not interested in obtaining Emma's money or property.
[4] "The court does not attribute Emma's behavior during trial solely to the urinary tract infection. The court observed Emma's behavior for three full days in December of 2005 and two full days in January of 2006, and her behavior was as described above. There is no suggestion that Emma was suffering from a urinary tract infection then. Even if she was suffering from a urinary tract infection, the antibiotics prescribed for her on February 8, 2006, would have been completed on February 13 or 14. Emma's disorientation cleared up with 24 hours when she was at the hospital in June of 2005 for the same condition. The difference between June of 2005 and February of 2006 is that Emma was no longer living with anyone who monitors whether she was taking her medication. Samantha, who took her to the hospital on February 8, testified that she did not know if Emma had finished her medication. Because Emma was diagnosed with two urinary tract infections in such a short period of time, the court questions whether she took all of her antibiotics as prescribed."
[5] And because substantial evidence supports finding Emma incapacitated, any error is harmless.
[6] At some point Emma inadvertently let her homeowners' insurance lapse and apparently she often paid bills even when the statements showed a credit balance.
[7] In this opinion, the statutory citations to the AVA refer to the version in effect in 2004 and 2005. Effective July 22, 2007, some sections of the AVA were amended in ways that do'not affect this appeal.
[8] Ron and Don contend the Sauls and the Gabeleins argue for the first time on appeal that the court erred in not addressing whether. Emma was a vulnerable adult at the time of the Purchase and Sale Agreement in 2004. But below the Sauls and the Gabeleins took the position that the AVA required proof that Emma was vulnerable when she was allegedly exploited in 2004.
[9] Emma, the Sauls, and the Gabeleins assert the relevant time period was when the purchase agreement for the third sale was signed on June 15, 2004. Ron and Don assert the last exploitation occurred at the closing on May 16, 2005. Because substantial evidence supports finding Emma incapacitated before June 2004, we need not resolve the parties' disagreement about the relevant time period.
[10] The court expressly found the psychologist's report of Emma's statement credible.
[11] Emma, the Sauls, and the Gabeleins also contend that only the donor may challenge the transaction and that White only applies to a rescission action. But the holding in White is not limited to actions by donors to rescind. See Matter of Estate of Eubank, 50 Wash.App. 611, 619-20, 749 P.2d 691 (1988); Lewis, 45 Wash.App. at 388-89, 725 P.2d 644.
[12] Samantha's testimony also supports the challenged finding that Samantha knew Emma did not know the value of the property.
[13] This challenged finding is supported by substantial evidence. The property was assessed at $195,524 in 2001, and an appraisal showed the land alone was worth at least $300,000 two years after the Sauls bought it.
[14] The court's finding that the appraisal Ron and Don submitted was more credible is unchallenged. According to that appraisal, the five acres was worth $324,000 in June 2004.
[15] Because the findings, conclusions, and protective order only relate to the 2004 real estate transaction, we need not address challenges to the findings and conclusions related to the first sale to Dina Thompson and her spouse, who are not parties to this action nor subject to the protective order.
[16] The White court also distinguished inter vivos gifts from will contests. In will contests, the initial burden is on the party challenging the testamentary gift. By contrast, with an inter vivos gift the' donor "strips himself of that which he can still enjoy and of which he may have need during his life. . . ." White, 33 Wash.App. at 371, 655 P.2d 1173 (quoting Whalen v. Lanier, 29 Wash.2d 299, 312, 186 P.2d 919 (1947)).
[17] The court rejected the testimony that. Emma approached the Sauls. The trial court relied on Emma's statement to the psychologist that the Sauls asked her to sell them property and "she agreed. . . ." And in the protection order hearing, Emma again stated that the Sauls "c[a]me and asked" about buying the property.
[18] Because the trial court found Sandy Fisher's testimony about the sale in 2004 noncredible, Emma, the Sauls, and the Gabeleins assert substantial evidence does not support the trial court's finding that the conversation occurred. But while the court rejected Sandy Fisher's testimony that Emma was not exploited in the 2004 sale as not credible, the court expressly found her testimony about the conversation with Vernon was credible.
[19] Former RCW 74.34.020(2)(d).
[20] Emma, the Sauls, and the Gabeleins argue that because Shorty always controlled the finances, Emma never had a chance to sell anything or give expensive gifts before he died. But for at least the first three years after Shorty died, Emma continued to live very frugally and did not sell any property. The largest gift Ron remembered Emma ever giving was $75 to her sister Annie on her 75th birthday in 2000.
[21] Because we affirm, we also conclude the trial court did not abuse its discretion in awarding Ron and Don attorney fees under RCW 11.96A.150 and RCW 74.34.130.