FILED
11/16/2020
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Guardianship of T.H., an alleged incapacitated person, | ) ) ) | No. 81835-0-I |
| Appellant. | ) ) ) ) ) ) | PUBLISHED OPINION |

VERELLEN, J. — A person may be found incapacitated if he has a significant risk of personal or financial harm based upon his current condition and history. That person may still present such a risk to themselves even when effective caretakers mitigate the risk. Because the State demonstrated T.H. currently presents significant risks of harm to his mental health and financial well-being, the court did not err by concluding he required a guardian.

Therefore, we affirm.

FACTS

T.H. was charged with assault in September of 2008 and found incompetent to stand trial. He was sent to Western State Hospital (WSH) in May of 2009 and has remained there since. This is his twelfth admission to WSH in a lifetime affected by paranoid schizophrenia.

During this admission, T.H.'s mental processes have become more stable; his behavior has become more predictable and calmer; and he has become less angry, aggressive, and threatening. But his progress has "reached a plateau," and his doctors do not believe continued care at WSH will improve his mental health.[1] His care providers been trying for years to discharge T.H. to a less restrictive setting, but they have been unable to do so because his delusional thinking affects the discharge process. T.H.'s only income is from Social Security, but he believes he is a multimillionaire and owns many properties. As a result, he cannot accurately apply for Medicaid, which he needs to live in an adult family home and receive medical services outside of WSH. He also does not accept that he has psychiatric problems or that he takes medication to address his mental health. With no family willing to become involved, the State petitioned for appointment of a guardian for T.H. to help with his transition from WSH into a community setting.

The court conducted a bench trial, entered findings of fact, and appointed a limited guardian over T.H.'s person and estate.

T.H. appeals.

<u>ANALYSIS</u>

The State contends we should apply the abuse of discretion standard to review the trial court's decision to find T.H. incapacitated and in need of a guardian. The State cites <u>In re Mignerey's Guardianship</u> for support, but it is not

---

[1] Report of Proceedings (RP) (Jan. 17, 2019) at 109.

applicable here.[2] In <u>Mignerey</u>, the disputed issue was whether the trial court could appoint a different guardian than requested by the petitioner.[3] The parties did not dispute a guardian was required.[4] Unlike <u>Mignerey</u>, the issue here is whether the trial court misconstrued RCW 11.88.010(1) when determining T.H. was incapacitated and required a guardian.[5]

As a mixed question of law and fact, we review that decision de novo, applying the law to the facts found by the trial court.[6] A challenged finding of fact is sufficient when supported by substantial evidence.[7] We review a court's interpretation of a statute de novo.[8] We interpret a statute to uphold the intent of

---

[2] 11 Wn.2d 42, 118 P.2d 440 (1941).

[3] <u>Id.</u> at 45-46.

[4] <u>Id.</u> at 44.

[5] We note that this situation is distinct from whether a guardian ad litem is required to represent the interests of a litigant found to be incompetent for purposes of a lawsuit. See <u>In re Marriage of Blakely</u>, 111 Wn. App. 351, 357-58, 44 P.3d 924 (2002) (distinguishing appointment of a guardian under chapter 11.88 RCW and appointment of a guardian ad litem for a litigant under RCW 4.08.060).

[6] <u>Garcia v. Dep't of Soc. & Health Servs.</u>, 10 Wn. App. 2d 885, 913, 451 P.3d 1107 (2019); see <u>Franklin County Sheriff's Office v. Sellers</u>, 97 Wn.2d 317, 329-30, 646 P.2d 113, 119 (1982) ("Mixed questions of law and fact, or law application issues, involve the process of comparing, or bringing together, the correct law and the correct facts, with a view to determining the legal consequences.").

[7] <u>Endicott v. Saul</u>, 142 Wn. App. 899, 909, 176 P.3d 560 (2008).

[8] <u>In re Guardianship of Beecher</u>, 130 Wn. App. 66, 70, 121 P.3d 743 (2005) (citing <u>Castro v. Stanwood Sch. Dist. No. 401</u>, 151 Wn.2d 221, 224, 86 P.3d 1166 (2004)).

the legislature, looking to the statute's plain language to do so.[9]  Only if the statute's terms are ambiguous do we engage in statutory construction.[10]

To determine whether a person is incapacitated and requires a guardian, a court can find the person either "has a significant risk of personal harm based upon a demonstrated inability to adequately provide for nutrition, health, housing, or physical safety" or "is at significant risk of financial harm based upon a demonstrated inability to adequately manage property or financial affairs."[11]

T.H. argues RCW 11.88.010(1) requires evidence of a "current risk of harm" for a finding of incapacity, and the court misinterpreted the statute by finding him incapacitated when he currently "is in a setting where there is no risk of harm to his person or estate."[12]  The State contends "[n]owhere does the guardianship statute require imminent or current harm to find a person incapacitated."[13]  The more precise issue before us is whether a person who has caregivers to mitigate any actual, serious, harmful consequences qualifies under RCW 11.88.010(1) as having "a significant risk" of personal or financial harm.  We conclude there can be a current significant risk of personal or financial harm warranting the appointment

---

[9] Id. at 70-71 (citing Campbell v. Dep't of Soc. & Health Servs., 150 Wn.2d 881, 894, 83 P.3d 999 (2004)).

[10] State, Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wn.2d 1, 12, 43 P.3d 4 (2002).

[11] RCW 11.88.010(1)(a)-(b).

[12] Appellant's Br. at 11-12, 14.

[13] Resp't's Br. at 15.

of a guardian, even if current caregivers have been successful in avoiding harmful consequences.

We first consider whether any risk of harm must be current or imminent for a finding of incapacity. RCW 11.88.010(1)(a) provides for a finding of incapacity "as to person" when an individual "has a significant risk of personal harm." RCW 11.88.010(1)(b) provides for a finding of incapacity as to the individual's estate when he "is at significant risk of financial harm." Both subsection .010(1)(a) and subsection .010(1)(b) use the ordinary present tense to indicate when the person must be demonstrably at risk to be found incapacitated, indicating the need to find "conditions or states that occur in the present."[14] Subsection .010(1)(c) also reflects the need to primarily consider evidence about an allegedly incapacitated individual's history up through the present. That section requires that a finding of incapacity be "based upon a demonstration of management insufficiencies over time in the area of person or estate."[15] Thus, when making a finding of incapacity, a trial court decides based upon an allegedly incapacitated individual's current conditions and history of "management insufficiencies . . . in the area of person or estate."[16]

---

[14] See THE CHICAGO MANUAL OF STYLE, § 5.129 at 267 (17th ed. 2017) (discussing present tense). Our reasoning here does not preclude the possibility that different circumstances featuring an as-yet-unrealized risk of significant harm could justify a finding of incapacity.

[15] RCW 11.88.010(1)(c).

[16] RCW 11.88.010(1)(a)-(c). The State argues we should analyze RCW 11.88.010(1) by analogizing to the Involuntary Treatment Act, chapter 71.05 RCW. "Although the guardianship statutes and the involuntary commitment statute may apply to some of the same people, the statutes operate independently

The State warns this interpretation will produce absurd results by "requir[ing] the person's caregivers who wished to pursue guardianship to place the person at risk of harm in order to meet the legal criteria for guardianship."[17] But this concern assumes a person cannot present a significant risk of harm to themselves while being cared for. RCW 11.88.010(1) does not require that the significant risk of harm actually manifest due to a person's inability to provide for their person or manage their estate. A person with late-stage dementia could be well provided for by others and still demonstrate an inability to provide for themselves. Indeed, the statute allows a finding of incompetency based upon age alone, presuming anyone under the age of majority is unable to provide for themselves whether or not they currently have caregivers.[18] The State's concern is not persuasive. A showing of specific, actual, imminent harm by virtue of removing current caregivers is not required to establish a current significant risk of harm for purposes of the guardianship statute.

The remaining question is whether the trial court correctly concluded T.H. was incapacitated as to his person and estate based upon its findings of fact. We review a trial court's decision after a bench trial to determine whether the findings of fact are supported by substantial evidence and whether those findings, in turn,

---

to achieve different purposes." In re Schuoler, 106 Wn.2d 500, 504, 723 P.2d 1103 (1986). Because the issues here are particular to guardianship rather than involuntary treatment, we decline to analogize between them.

[17] Resp't's Br. at 16.

[18] RCW 11.88.010(1)(d).

support the conclusions of law by clear, cogent, and convincing evidence.[19] Substantial evidence supports a finding of fact where a sufficient quantity of evidence exists to persuade a reasonable person of its truth.[20] Unchallenged findings are verities on appeal.[21]

Finding of fact 5.2 states T.H. presents a "significant risk of financial harm based upon a demonstrated inability to adequately manage his financial affairs."[22] T.H. testified he has $750 million, which is an unfounded delusion. His psychiatric social worker testified T.H.'s delusional beliefs about wealth and owning many properties can impair his ability to make realistic financial decisions, such as paying bills or obtaining health care coverage. T.H. explained he once spent more than one month's earnings to buy a car, despite not having a driver's license.[23] His treating psychologist testified T.H. "has really no clear conception of money . . . and what things would really cost, and how to go about navigating that in the community."[24] And T.H. does not challenge a related finding of fact that he "lacks the cognitive organization to manage anything more than small amount[s] of

---

[19] Endicott v. Saul, 142 Wn. App. 899, 909, 176 P.3d 560 (2008) (citing Dorsey v. King County, 51 Wn. App. 664, 668-69, 754 P.2d 1255 (1988)).

[20] Ursich v. Ursich, 10 Wn. App. 2d 263, 271, 448 P.3d 112 (2019) (citing In re Estate of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004)), review denied, 194 Wn.2d 1022 (2020).

[21] Endicott, 142 Wn. App. at 909 (citing Jones, 152 Wn.2d at 8).

[22] CP at 93.

[23] See RP (Jan. 17, 2019) at 31 (T.H. testifying he spent $810 on a car); CP at 16 (guardian ad litem report noting T.H. earns $750 per month from Social Security).

[24] Id. at at 107-08.

money."[25]  Substantial evidence supports the court's finding that T.H. is unable to adequately manage his financial affairs.  The same evidence also supports finding of fact 5.5, that "[T.H.] is unable to manage property without the risk of harm, delusionally believing that he has millions of dollars in the bank and owns multiple properties."[26]

Finding of fact 5.3 states T.H. "has a history of not sufficiently managing his mental health needs, leading to harmful interactions with others and [with] law enforcement."[27]  T.H. does not believe he experiences mental illness or takes medications to treat it, stating he has only physical ailments and takes only vitamins.  He testified that when he lived with his sister, "she had to kick me out" and "called the cops and the sheriff there to get me" after he and his sister got into a physical altercation and he "grabbed her granddaughter."[28]  The car he bought was confiscated by the sheriff because he was driving it without a license.  When T.H. was in jail, he refused his medications, denied he had a mental illness, and had to be forcibly medicated.  His social worker also explained that "in the past, there's been a pattern of when [T.H.] has stopped taking his medications and stopped getting psychiatric care[,] then that's when the behaviors in the past have

---

[25] CP at 93.

[26] Id.

[27] Id.

[28] RP (Jan. 17, 2019) at 29.

turned to violent situations, and that's when law enforcement has gotten involved."[29]  Substantial evidence supports finding of fact 5.3.

Finding of fact 5.6 states T.H. "has refused recommended medical care."[30] His psychiatric social worker explained T.H. has "a history of poor compliance in the community, which basically means that, like, he was refusing treatment, whether that's going to a psychiatrist or a case manager, refusing medications, and so forth."[31]  While at WSH, T.H. has declared himself a psychologist and has said "he knows whether or not he needs treatment."[32]  While jailed, T.H. refused to take his medications and denied he was mentally ill.  After being diagnosed with bladder cancer while at WSH, T.H. denied he was sick or had been diagnosed and refused to accept treatment because, as his psychologist explained, "in his mind, he did not have the condition."[33]  This struggle is ongoing, and he continues to resist his annual checkup to ensure the cancer has not reoccurred.  T.H. has other health problems, like high blood pressure, and has regularly refused to take medication for it because he did not believe it presented a risk of stroke.  From this evidence, a rational fact finder could conclude T.H. refuses recommended medical care.

---

[29] Id. at 84.

[30] CP at 93.

[31] RP (Jan. 17, 2019) at 74.

[32] Id. at 101.

[33] Id. at 100.

In finding of fact 5.1, the court concluded T.H. "is at significant risk of personal harm based upon a demonstrated inability to adequately provide for his personal needs."[34] RCW 11.88.010(1)(a) provides that a significant risk of harm to the person includes risks to health. Because findings of fact 5.3 and 5.6 are supported by substantial evidence and themselves support a conclusion that T.H. has demonstrated an inability to care for his mental and physical health, finding of fact 5.1 is also supported by substantial evidence.

RCW 11.88.010(1) allows a finding of incapacity when a person is currently a significant risk of personal or financial harm to themselves.[35] The trial court weighed whether a less restrictive arrangement, such as a representative payee, would be in T.H.'s best interests.[36] Based upon T.H.'s history of management insufficiencies and current conditions, these findings clearly, cogently, and convincingly demonstrate his inability at the present time to adequately provide for his health and to adequately manage his financial affairs.[37] Although the risk of significant harm to T.H. is not imminent thanks to his caretakers at WSH, the risk

---

[34] CP at 92.

[35] RCW 11.88.010(1)(a),(b).

[36] See RP (Jan. 17, 2019) at 76-78 (psychiatric social worker testifying about representative payees and that T.H. would benefit more from a guardian than representative payee); id. at 137-39 (trial court rejecting the sufficiency of a representative payee in lieu of a guardianship and considering the sufficiency of a an assisted living facility).

[37] T.H. also assigns error to finding of fact 5.7, which states T.H. "requires a guardian to advocate for his needs and provide an additional layer of support to prevent him from coming to harm." CP at 93. Because this is a mixed conclusion of law and fact, we review it de novo. Garcia, 10 Wn. App. 2d at 913. For the reasons explained, it was not erroneous.

of significant harm is current and supports findings of incapacity. Because the court's findings of fact support its application of RCW 11.88.010(1) to conclude that T.H. required a guardian, it did not err.

Therefore, we affirm.

_____

WE CONCUR:

_____    _____