**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In the Matter of the Guardianship of: | No. 55001-6-II |
| VERNON JACOB HORST, | |
| An Alleged Incapacitated Person. | |
| MARGARET GARRISON, | |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| DELBERT LEE McGILL, | |
| Appellant. | |

WORSWICK, J. — This is a case involving elder financial abuse. Delbert "Lee" McGill used his influence over 90-year-old Vernon Jacob Horst to obtain title to Horst's 300-acre farm and possession of all its equipment, supplies, and livestock. Margaret Garrison, Horst's daughter and guardian, filed a petition under the Trust and Estate Dispute Resolution Act (TEDRA) to regain possession of the property. The trial court entered a judgment quieting title and also entered a vulnerable adult protection order restraining McGill from contacting or further exploiting Horst.

McGill appeals the trial court's orders arguing that (1) the trial court's findings are not supported by substantial evidence and (2) the findings do not support the trial court's conclusions

of law. McGill also argues that (3) he did not exceed the power granted to him as Horst's attorney-in-fact, (4) he did not have the burden of proving that the transfer was not a result of undue influence, (5) he did not unduly influence Horst, and (6) he did not financially exploit Horst.

We disagree with McGill and affirm the trial court's orders. We also award reasonable attorney fees on appeal to Garrison.

FACTS

Horst had been living on his farm in Yelm, Washington, since he returned from World War II. Over several years, Horst expanded his farm from 40 acres to about 300 acres. In addition to his farm, Horst operated other businesses such as a grain business, lumber business, trucking company, heavy equipment operating business, scrap metal business, and others. Garrison is the daughter and now-guardian of the person and estate of Horst. At the time of the trial, Horst was 93 years old.

Horst met McGill in 2000 at a bowling alley, where they were bowling partners until 2003. In 2006, Horst and McGill agreed that McGill would move into a spare bedroom in Horst's trailer home on the farm, and that McGill would work on the farm in lieu of paying rent. McGill lived in Horst's home before moving to a trailer on Horst's farm. Shortly after, McGill moved his wife, his mother, and his stepson to the farm. None of them paid rent while they lived on the farm.[1]

---

[1] The parties' briefs include extensive discussion regarding whether McGill worked at Greg Johnson Automotive and received unreported income. However, that fact is not relevant to our analysis and was not included in the trial court's findings. Thus, we do not address the parties' discussion.

As Horst aged, he relied more heavily on McGill to manage his finances and to care for the farm. Although Horst owned many businesses during his lifetime, his mental acuity diminished as he aged. For example, Horst fell victim to foreign lottery schemes on multiple occasions. In 2017, Horst was adjudicated to be incapacitated. The parties agree that Horst was incompetent to testify at trial.

In February 2015, Horst's farmhouse burned down. Horst was severely injured during the fire. He was transported to Harborview Medical Center where he was placed into a medically induced coma and hospitalized for over two weeks. Horst's injuries were so severe that he required a tracheostomy tube, an alternate airway, to allow him to breathe. The tube made it practically impossible for Horst to verbally communicate.

While Horst was in the hospital, McGill learned that before the fire, Horst had granted his bookkeeper, Kim Craddock, a power of attorney and attempted to transfer his property to her by executing a quit claim deed. Although it is not completely clear from the record on appeal, it appears the quit claim deed to his property was granted as a type of collateral for debt owned by Horst to Craddock. Craddock did not record the deed. The record on appeal does not include the basis for this debt or explain when this conveyance occurred.

McGill brought a notary to the hospital to secure Horst's signature granting McGill power of attorney over Horst. The power of attorney provided:

> A. The agent shall act on my behalf and for my benefit, and shall have all powers over my estate that I have or acquire. These shall include, but not be limited to, the following: the power to make deposits to, and payments from, any account in my name in any financial institution; the power to open and remove items from any safe deposit box in my name; the power to sell, exchange or transfer title to stocks, bonds or other securities; the power to sell, convey or encumber any real or personal property.

. . . .

> (If gifts are authorized under paragraph D, either initial next to "in any amount" or initial next to "no more than" and fill in a dollar amount. If gifts are not authorized, cross out all of paragraph D.)

> No gift may be made under this power of attorney, except to a spouse or registered domestic partner if authorized under paragraph 1 (C), unless authorized by this paragraph.

Ex. 1 at 2. Subsection D was crossed out. The power of attorney expressly excluded the power to gift any of Horst's real or personal property. For the entire time that Horst was hospitalized, McGill managed and controlled the farm under his power of attorney. McGill also had control over Horst's personal property. Horst clearly trusted McGill. McGill was aware of debt owed to Craddock but did not attempt to address that transaction or resolve the debt owed. When Horst was discharged, he suffered from a diminished mental state and memory loss, and was not capable of making financial decisions.

Horst was discharged from the hospital to Garrison's home on February 18. While Horst was recovering from his injuries, McGill picked up Horst from Garrison's house when Garrison was at work. McGill then obtained Horst's signature on quit claim deeds conveying all of Horst's real property to himself. After the deeds were rejected for insufficient legal descriptions, McGill revised and consolidated the deeds on March 20, and obtained Horst's signature a second time.[2] McGill then used his power of attorney to sign a Real Estate Excise Tax Affidavit (REETA). That same day, McGill recorded the revised quit claim deeds, purporting to transfer all of Horst's real property to himself at no cost.

---

[2] McGill initially drafted eight quit claim deeds, each conveying a parcel of Horst's land. When those deeds were rejected by the Auditor, McGill drafted a new quit claim deed, consolidating all the parcels onto one deed.

During McGill's initial attempt to record the deeds in February, Horst was "very ill, very frail and could not stand at the counter at the Thurston County Auditor's office to complete the transaction." Clerk's Papers (CP) at 39. During this period, Horst could not identify his family, could not identify whether McGill was family or not, and did not understand the transaction. McGill and his wife drafted all the required documents for the transfer: the power of attorney, the REETA, and the deeds. McGill and his wife actively procured the transaction by driving Horst to notarize his signature on multiple occasions. McGill did not allow Horst an opportunity to obtain the advice of legal counsel, nor did he inform Horst's family of the transaction.

After McGill recorded the revised deeds, Horst returned to the farm against his family's advice. Horst insisted on going back to take care of his animals and run his farm. He returned to the property and treated it as his own: he continued to sell cattle and hay and operate equipment. McGill then filed a lawsuit against Horst, along with an injunction to preclude Horst from operating the farm as his own. This lawsuit was dismissed in 2019.[3]

## II. PROCEDURAL HISTORY

Garrison filed a TEDRA petition seeking the return of Horst's real and personal property. Following a bench trial, the trial court entered findings of fact and conclusions of law, as well as a judgment quieting title to all the real and personal property in Horst. The trial court also entered a permanent Vulnerable Adult Restraining Order, which found that McGill had financially exploited Horst and restrained McGill from contacting or further exploiting Horst.

McGill appeals the trial court's judgment and orders.

---

[3] It is unclear from the record why the lawsuit was dismissed.

No. 55001-6-II

## ANALYSIS

### I. SUBSTANTIAL EVIDENCE: CHALLENGED FINDINGS OF FACT

McGill makes 33 assignments of error, assigning error to almost every finding of fact and conclusion of law. All of McGill's challenges to the findings of fact fail, except for three. However, the three unsupported findings do not warrant reversal. We hold that the remaining challenged factual findings are supported by substantial evidence.

We review a trial court's findings of fact following a bench trial to determine whether those findings are supported by substantial evidence. *In re Estate of Barnes*, 185 Wn.2d 1, 9, 367 P.3d 580 (2016). Substantial evidence is that which is sufficient to persuade a fair-minded person of the truth of the premise. *In re Marriage of Condie*, 15 Wn. App. 2d 449, 459, 475 P.3d 993 (2020). We defer to the trial court for resolution of conflicting testimony and credibility. *Barnes*, 185 Wn.2d at 9.

"When a challenged factual finding [must] be proved at trial by clear, cogent, and convincing evidence, we incorporate that standard of proof in conducting [a] substantial evidence review." *In re Estate of Jones*, 170 Wn. App. 594, 603, 287 P.3d 610 (2012). When such a finding is appealed, we review whether there is substantial evidence in light of the "highly probable" test. *In re Estate of Melter*, 167 Wn. App. 285, 301, 273 P.3d 991 (2012). In other words, we will not disturb a finding if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent, and convincing. *In re of Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019).

Assignments of error to findings of fact that are not argued in a brief are abandoned on appeal. *In re Marriage of Glass*, 67 Wn. App. 378, 381 n.1, 835 P.2d 1054 (1992). And,

6

unchallenged findings of fact are verities on appeal. *Hornback v. Wentworth*, 132 Wn. App. 504, 508, 132 P.3d 778 (2006). We review conclusions of law de novo to determine if they are supported by the findings of fact. *Barnes*, 185 Wn.2d at 9.

As an initial matter, we note that the trial court found Garrison and the witnesses she called to be credible. Conversely, the trial court found McGill and the witnesses he called not credible. Much of McGill's arguments appear to invite us to reweigh the evidence or question the trial court's credibility determinations. We do not engage in this type of analysis, but instead we review the evidence against McGill's assignments of error.

A.      *Findings of Fact*

i. Findings of Fact 3 and 19

McGill argues that the trial court erred in finding that he worked on the farm in exchange for rent. We disagree.

At trial, McGill admitted that he had been living with Horst since 2006. He also admitted that he never paid Horst rent. McGill also admitted that shortly after moving onto the farm, he moved his family with him to live on Horst's farm rent free. Garrison introduced evidence that McGill lived on the farm in exchange for rent. For example, in a financial declaration prepared in 2012, McGill's wife attested that McGill "works for rent."[4] Ex. 23 at 48. Garrison also introduced uncontroverted evidence that it was customary for Horst to arrange for those working on his farm to live for free instead of paying rent. The finding is supported by substantial evidence.

---

[4] This financial declaration was filed under criminal cause number 12-1-01725-9, which culminated in McGill's wife pleading guilty to three counts of second degree theft, one count of first degree theft, and one count of identity theft in 2013.

McGill appears to argue, without citation to authority, that because the trial court made a finding that McGill was not credible, no factual finding can be based on his testimony. We reject this argument. We do not find it inconsistent for a trial court to make a negative credibility finding and still rely on some of the witness's statements to support some findings of fact. This is because it is unlikely that a trial court would find every single statement made by such a witness to be unreliable. We do not require a trial court to parse every statement an unreliable witness makes, but instead, we assume that the discrete statements a witness makes that support findings have been deemed to be reliable by the trial court.

ii. Finding of Fact 4

McGill challenges the portion of finding 4, where the trial court found that Horst was living alone with McGill, was isolated, and was financially dependent on McGill. We hold that the facts that Horst was living alone with McGill and was isolated are not supported by substantial evidence.

There is no evidence on the record on appeal showing that Horst lived alone with McGill. This is because McGill's family also lived on the farm. Nor does the evidence in the record support a finding that Horst was isolated. Horst's daughter and granddaughter visited the farm frequently, and Horst spent every holiday with his family. Therefore, these facts are not supported by substantial evidence.

However, McGill testified that he paid all of Horst's bills and expenses. This is sufficient evidence to support a finding that Horst was financially dependent on McGill.

iii. Finding of Fact 7

Although McGill assigns error to finding of fact 7, where the trial court found that Horst could not verbally communicate while he was in the hospital, his brief contains no argument regarding this finding. Because the error assigned is not argued in his brief, the finding is a verity on appeal. *Glass*, 67 Wn. App. at 381 n.1; *Wentworth*, 132 Wn. App. at 508.

iv. Findings of Fact 10 and 13

McGill challenges the portions of finding of fact 10 related to Horst's mental capacity upon discharge and his capacity to understand the purported transfer of property. He also argues that insufficient evidence supports finding of fact 13 that found Horst to be ill, frail, and incapable of standing at the auditor's office. We hold that substantial evidence supports findings of fact 10 and 13.

Findings of fact 10 and 13 provide:

10. Mr. Horst was released from the hospital in late February of 2015. At the time, Mr. Horst: 1) suffered from a diminished mental state; 2) suffered from memory loss; and 3) was not capable of making financial decisions. At the time he transferred his property to Mr. McGill, Mr. Horst: 1) lacked capacity; 2) could not identify his family; 3) could not identify whether Mr. McGill was a family member or not; and 4) did not understand the transaction.

 . . . .

13. In March 20, 2015, at the time of the signing and recording of the revised quit claim deeds, Mr. Horst was very ill, very frail and could not stand at the counter at the Thurston County Auditor's office to complete the transaction.

CP at 38-39.

A person lacks testamentary capacity if, at the time of conveyance, "'he has sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the nature and extent of the property which constitutes his estate and of which he is

9

contemplating disposition, and to recollect the objects of his bounty.'" *In re Estate of Bussler*, 160 Wn. App. 449, 461, 247 P.3d 821 (2011) (quoting *In re Bottger's Estate*, 14 Wn.2d 676, 685, 129 P.2d 518 (1942)).

Substantial evidence supports the trial court's findings. Evidence produced at trial showed that Horst was approximately 90 years old when his farmhouse caught fire. He was severely injured and was hospitalized for over two weeks. He was placed into a medically induced coma and required a tracheostomy tube to allow him to breathe. At that time, it was impossible for Horst to verbally communicate. Friends and family who had visited Horst at the hospital testified that he "couldn't talk," and that he was "very weak." Verbatim Report of Proceedings (VRP) (Mar. 9, 2020) at 141. Garrison described him as "not real lucid" and said that he "couldn't talk at all." VRP (Mar. 9, 2020) at 155.

When Horst was discharged on February 18, the hospital agreed to discharge him on condition that Garrison would be his caretaker. Horst was "very shaky," and Garrison had to bathe him, shave him, and help him "with just about anything he needed to do." VRP (Mar. 9, 2020) at 156. Garrison's husband testified that Horst was

> [s]till very shaky, very disoriented. He slept most of the time. Physically he still had a [tube] that was taped over. . . . His face was bruised. He had trouble breathing. He didn't speak much at all and he slept.

VRP (Mar. 9, 2020) at 135.

In February, when McGill first attempted to convey the property, Doreena Baird, an employee at the Assessor's office who handled the transaction to transfer Horst's property to McGill, testified that she had known Horst for years through her job. She further testified:

Q: Do you recall Mr. Horst coming in to transfer his property in 2015?

A: I do.

Q: What makes you recall that particular transaction?

A: The day that he came in left a lasting impression on me. It's a vivid memory that I haven't been able to shake. It's something that I was struggling with the day that he came in. He—I remember sitting with him. I remember holding his hand.

. . . .

Q: How did he look?

A: He looked very ill. He looked—he—something traumatic happened to him. I could tell that just by his appearance alone . . . there was visibly something wrong with him. . . . he looked like he was going to die. He didn't look good.

VRP (Mar. 10, 2020) at 10-16. Baird also testified that Horst could not identify his family, he did not indicate that he understood the transaction, and he did not know if McGill was family or not. Baird was so upset about Horst's condition and the transaction that she cried in her office after Horst and McGill left. After the conveyance, Horst showed Garrison a copy of the deed and stated that he did not understand the document. Horst stated that he did not understand what the deed was for.

Although the record does not contain explicit evidence of Horst's capacity on March 20, it contains ample evidence that Horst did not have sufficient mind and memory to understand the transaction, and he did not comprehend the nature and extent of the property both before and after the conveyance. Based on the evidence admitted at trial, we can confidently infer that Horst lacked capacity at the time of conveyance on March 20. Due to Horst's age, description of his mental capacity, physical condition following the fire, and evidence of his confusion before and after the conveyance, the finding that Horst lacked testamentary capacity is supported by

11

substantial evidence.  Our review of the record shows that the remaining findings in Findings 10 and 13 are also supported by substantial evidence.

v.  Finding of Fact 16

McGill argues that substantial evidence does not support a finding that he obtained control over Horst's personal property. We disagree.

McGill testified at trial that he had been paying the farm's bills and expenses since 2015. McGill also testified that he signed checks on Horst's behalf.  He further testified that Horst signed over to him an "operating farm," the cows, and all the farm equipment including tractors, an excavator, and all the farming material.  VRP (Mar. 9, 2020) at 79-80.  Therefore, the finding is supported by substantial evidence.

vi.  Finding of Fact 17

McGill argues that the court erred in finding that Horst granted Craddock power of attorney and quit claim deeds transferring the farm to her.  We disagree.

Finding of fact 17 provides, in relevant part:

> 17. During this same timeframe in early 2015, Mr. Horst also granted a power of attorney to his bookkeeper, Kim Craddock. In addition to granting power of attorney to Ms. Craddock, Mr. Horst also executed quit claim deeds purporting to transfer his property to Ms. Craddock.

CP at 40.

During trial, McGill testified that it was his understanding that Horst granted Craddock a quitclaim deed to his property.  McGill also testified that Craddock showed him a power of attorney and that he drafted a document for Horst's signature revoking a power of attorney Horst granted to Craddock. Additionally, Bonnie McIntosh, Horst's neighbor, who is a notary, testified

12

that she recalled Horst quitclaiming his property to Craddock. Thus, this finding is supported by substantial evidence.

vi. Findings of Fact 18 and 23

McGill argues that the evidence does not support the trial court's finding that he and his wife actively participated in the preparation and procurement of the transaction conveying Horst's proper to McGill. We disagree.

Finding of fact 18 provides:

18. After learning that Mr. Horst had purported to transfer his property to Ms. Craddock, Mr. McGill and Mrs. McGill admittedly and actively participated in both the preparation and procurement of the quit claim deeds and excise tax affidavit. Mr. McGill and Mrs. McGill also procured the power of attorney naming Mr. McGill the attorney-in-fact for Mr. Horst. Mr. McGill admittedly and actively drove Mr. Horst to a notary to sign the deeds and to the office of the Thurston County Auditor and Thurston County Assessor to record the deeds on multiple occasions. Mr. McGill also procured a notary and brought that notary to Harborview Medical Center in order to secure Mr. Horst's signature on the power of attorney.

CP at 40. Finding of fact 23 contains a statement that McGill actively participated in the transaction.

At trial, McGill admitted that he had Horst sign the power of attorney only a week after the fire. McGill also admitted that a week after Horst was discharged from the hospital, he and his wife picked up Horst from Garrison's house and drove him more than an hour to find a notary and record the deeds. McGill also admitted that his wife drafted a new deed after the first deeds were rejected. McGill and his wife again drove Horst to the auditor's office to record the deed. McGill and his wife prepared every required document to complete the property transfer. McGill also testified that he drafted a power of attorney revocation letter revoking the power of

13

attorney that Horst granted to Craddock. Substantial evidence supports the contested sections of finding of fact 18 and 23.

vii. Finding of Fact 20

McGill challenges finding of fact 20, where the trial court found that Horst and McGill had a confidential relationship. We disagree.

Confidential relationships exist when one person has gained confidence of the other and purports to act or advise with the other's interest in mind, particularly where there is family relationship. *McCutcheon v. Brownfield*, 2 Wn. App. 348, 356-57, 467 P.2d 868 (1970). "Whether a confidential relationship exists is a question of fact." *Endicott v. Saul*, 142 Wn. App. 899, 922, 176 P.3d 560 (2008).

Here, the evidence showed that as Horst aged, he relied more heavily on McGill to manage his finances and to care for the farm. Horst's mental acuity diminished as he aged, and in 2017 he was adjudicated to be incapacitated. By his own admission, McGill paid all of Horst's bills and expenses. Christopher Schubkegel, McGill's friend, testified that McGill and Horst had a family-like relationship, and Geneva Fischer, Horst's family friend, said Horst often stated that McGill was like a son to him. Therefore, there is substantial evidence to support that Horst and McGill had a confidential relationship.

McGill cites *Kitsap Bank v. Denley*, 177 Wn. App. 559, 312 P.3d 711 (2013), to argue that the evidence was insufficient because "a friendship alone does not create a confidential relationship." But *Kitsap Bank* is distinguishable. There, the estate argued that there was a confidential relationship simply because the testator and the giftee were close friends. *Kitsap Bank*, 177 Wn. App. at 565-66. Here, McGill and Horst shared more than a friendship. Horst

14

considered McGill family, they lived together, and Horst was elderly and vulnerable; Horst also trusted McGill and heavily relied on him. McGill orchestrated the transaction when Horst was mentally, physically, and emotionally frail. Unlike the facts in *Kitsap Bank*, Horst did not act independently; in fact, McGill was heavily involved by drafting all the required documents, driving Horst to the auditor's office, and obtaining a notary to notarize the signature.

McGill also cites to *In re Estate of Lint*, 135 Wn.2d 518, 957 P.2d 755 (1998), suggesting that courts must find similar facts to support a finding of a confidential relationship. In *Lint*, the parties shared a romantic relationship when the testator was diagnosed with terminal cancer. *Lint*, 135 Wn.2d at 523. The beneficiary revised the testator's will and made himself the main beneficiary of the testator's estate. *Lint*, 135 Wn.2d at 528. However, in *Lint*, the beneficiary conceded to the existence of a confidential relationship and the court did not examine whether a confidential relationship existed. *Lint*, 135 Wn.2d at 537. Therefore, *Lint* is not instructive.

Therefore, McGill's arguments fail and finding of fact 20 is supported by substantial evidence.

viii. Finding of Fact 21

McGill contests finding of fact 21, which provides that Horst and McGill shared a fiduciary relationship. Fiduciary relationships are inherent in power of attorney relationships. *Barnes*, 185 Wn.2d at 11. McGill does not dispute that he was granted a general power of attorney. Therefore, the finding that Horst and McGill shared a fiduciary relationship is supported by substantial evidence.

ix. Findings of Fact 22 and 32

McGill argues that the trial court erred in finding that Horst lacked testamentary capacity at the time he transferred his property to McGill and in finding that Horst did not intend to transfer property to McGill. We disagree.

As discussed under finding of fact 10 and 13, substantial evidence supports a finding that Horst lacked testamentary capacity at the time of the conveyance. Horst was an elderly, ill man who had been recovering from a house fire. Garrison's husband testified that Horst was very shaky and very disoriented, and was under his total care during the day. After Horst's hospital discharge, hospital personnel told Garrison not to leave Horst alone. Baird testified that Horst looked ill and did not answer a number of questions Baird asked, such as if he remembered her and if he was transferring his property. Baird also asked Horst about his family, but Horst did not answer. He also did not identify that he understood he was transferring his property. After the conveyance, Horst stated that he did not understand what the deed was for and asked Garrison to help explain what the documents were.

Because substantial evidence supports a finding that Horst lacked testamentary capacity, it follows that Horst could not have formed the requisite intent to transfer the property to McGill.

x. Finding of Fact 23

McGill contests the trial court's finding that he received an unusually large share of Horst's estate. We agree.

McGill transferred Horst's 300-acre farm to himself. McGill believed he had been given an operating farm including cattle, equipment, and other personal property. Although the conveyance is undoubtedly large, we cannot determine whether this is an unusually large share

16

of Horst's estate because the record contains no evidence of the entire value of the estate. *Kitsap Bank*, 177 Wn. App. at 578 ("We agree that $400,000 is a significant amount of money; however, we cannot determine whether this is a disproportionately large portion of [the] estate because the Estate presented no evidence of the entire value of the estate."). Therefore, this finding is unsupported by substantial evidence.

xi. Finding of Fact 25

McGill argues that the trial court erred in finding that McGill removed Horst from Garrison's care under false pretenses. We agree.

There is no evidence in the record to show that McGill removed Horst under false pretenses. The finding is unsupported.

xii. Finding of Fact 31

McGill challenges finding 31, where the trial court found that Horst continued to operate the farm as his own even after he transferred the land to McGill. We disagree.

McGill admitted at trial and again in his brief that after the conveyance, Horst continued to sell hay and cattle, and that Horst was using equipment. Moreover, McGill sued Horst in 2017 because Horst continued to operate his farm, and McGill tried to enjoin Horst from doing so. The finding is supported by substantial evidence.

B.      *Errors Do Not Warrant Reversal*

Although some facts in findings of fact 4, 23, and 25 are not supported by substantial evidence, we find that the errors do not warrant reversal.

"Even if a trial court relies on erroneous or unsupported findings of fact, immaterial findings that do not affect its conclusions of law are not prejudicial and do not warrant reversal."

*State v. Coleman*, 6 Wn. App. 2d 507, 516, 431 P.3d 514 (2018). "[E]rror without prejudice is not grounds for reversal." *Thomas v. French*, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983). Error is prejudicial if it affects, or presumptively affects, the outcome of the trial. *James S. Black & Co. v. P & R Co.*, 12 Wn. App. 533, 537, 530 P.2d 722 (1975). If the trial court could have relied on other findings to reach the same conclusion, then the error was not prejudicial and does not warrant reversal. *Coleman*, 6 Wn. App. 2d at 519.

Whether Horst was isolated and whether he lived alone with McGill is not dispositive. The facts in finding 4 added additional circumstances showing Horst's reliance on McGill. Other findings show the extent of Horst's reliance on McGill and the trust he had in him. For example, McGill lived with Horst, Horst granted McGill power of attorney, Horst had diminished capacity, and McGill controlled Horst's real and personal property. Those findings support the trial court's conclusion. Therefore, the trial court's error is harmless and does not warrant reversal.

Similarly, whether McGill obtained an unusually large share of Horst's estate is also harmless, because other factors support the same conclusion. The finding that McGill obtained an unusually large share of Horst's estate is only one factor among many others that support a presumption of undue influence. *Dean v. Jordan*, 194 Wash. 661, 671-72, 79 P.2d 331 (1938). Because substantial evidence supports all other factors relevant to a presumption of undue influence as discussed below, this particular finding has no bearing on the outcome. Therefore, this error does not warrant reversal.

Lastly, whether McGill removed Horst from Garrison's home under false pretenses is immaterial in determining any of the legal conclusions that the trial court made. *Coleman*, 6 Wn.

App. 2d at 516. Because the fact is immaterial to the analysis, the trial court's finding was harmless and does not warrant reversal.

Because the erroneous findings do not affect the ultimate conclusion, they are harmless and do not warrant reversal.

C.       *Findings of Fact That Contain Legal Conclusions*

Lastly, McGill assigns error to findings of fact 26, 27, 28, and 33. The trial court found that McGill financially exploited Horst, unduly influenced Horst, and exceeded his authority under the power of attorney. It also found that Garrison met her burden of proof. These findings are actually conclusions of law. Because we analyze findings and conclusions according to what they are as opposed to how they are labelled, we analyze those findings as conclusions of law below. *Para-Med. Leasing, Inc. v. Hangen*, 48 Wn. App. 389, 397, 739 P.2d 717 (1987).

II.  MCGILL EXCEEDED HIS POWER AS GRANTED BY THE POWER OF ATTORNEY

McGill argues that the trial court erred in finding that he exceeded his power of attorney as Horst's attorney-in-fact by signing the REETA on Horst's behalf. Specifically, McGill argues that although the REETA is a condition precedent to recording the deed, it does not itself convey property, and therefore, should not be deemed a violation of the powers granted by the power of attorney. We disagree.

"Chapter 82.45 RCW imposes an excise tax on every sale of real estate in the state of Washington." WAC 458-61A-100(1). A REETA is required for transfers by gift. WAC 458-61A-201(5)(a). "The county auditor will not file or record the instrument of conveyance or sale until all taxes due under this rule have been paid or the transfer is determined to be exempt from

tax as indicated by a stamped document." WAC 458-61A-301(7). A conveyance of property is invalid unless it is recorded. RCW 65.08.070(2).

A conveyance of property is a multi-step process that includes the execution of a quit claim deed, filing a REETA, and recording the deed. *See* RCW 64.04.030; WAC 458-61A-301(7); RCW 65.08.070 (2). Because gifting real property is often not completed in one step, we do not confine ourselves to focusing only on whether the REETA *in isolation* was a conveyance sufficient to find a violation of the power of attorney; instead, we examine the totality of the circumstances to determine if McGill exceeded his power of attorney by gifting himself the property.

Here, McGill used his power of attorney to sign the REETA and elect a tax exemption based on a gift. The power of attorney prohibited McGill from gifting any of Horst's property. The REETA was a required last step before the auditor's office could record the conveyance. WAC 458-61A-201(5)(a); RCW 65.08.070(2). Without the REETA, the gift would have been invalid. RCW 65.08.070(2). Because McGill used his power of attorney to complete the last step in the conveyance, he exceeded his power under the power of attorney.

Therefore, we hold that the trial court did not err in finding that McGill exceeded his power of attorney by signing the REETA, an essential step to completing the gift.

### III. UNDUE INFLUENCE

McGill argues that the trial court erred in concluding that McGill obtained title to Horst's property by exerting undue influence. We disagree.

A.      *Establishing Presumption of Undue Influence and Shifting the Burden of Proof*

"As a general rule, the party seeking to set aside an inter vivos gift has the burden of showing the gift is invalid." *Endicott*, 142 Wn. App. at 922. However, when the facts raise a presumption of undue influence, the burden of production shifts to the proponent of the conveyance, who must then rebut the presumption with evidence sufficient to "'balance the scales and restore the equilibrium of evidence touching the validity of the [conveyance].'" *Barnes*, 185 Wn.2d at 15 (quoting *Dean*, 194 Wash. at 672).

We consider factors established in *Dean v. Jordan* to determine whether a rebuttable presumption of undue influence has been created. 194 Wash. at 671-72; *Kitsap Bank*, 177 Wn. App. at 570-71. The three most important *Dean* factors are (1) a confidential or fiduciary relationship between the beneficiary and the donor, (2) the donee's active participation in the transaction, and (3) whether the donee received an unusually large part of the estate. *Kitsap Bank*, 177 Wn. App. at 570-71. The court also considers additional factors such as the age and mental or physical health of the testator, the nature of the relationship, the opportunity for exerting undue influence, and the naturalness of the gift. *Barnes*, 185 Wn.2d at 11. Whether the existence of the factors raises a presumption of undue influence is a highly fact-specific determination that requires careful scrutiny of the totality of the circumstances. *Barnes*, 185 Wn.2d at 11.

A confidential relationship exists when one person has gained the confidence of the other and "'purports to act or advise with the other's interest in mind.'" *Endicott*, 142 Wn. App. at 923 (quoting *McCutcheon,* 2 Wn. App. at 357). Confidential relationships generally arise from personal relationships, and family relationships are particularly likely to create confidential

relationships. *Kitsap Bank*, 177 Wn. App. at 572. In contrast, fiduciary relationships often arise from professional relationships. *Kitsap Bank*, 177 Wn. App. at 572. Fiduciary relationships are inherent in power of attorney relationships. *Barnes*, 185 Wn.2d at 15. Our Supreme Court specifically stated that the existence of either a confidential *or* fiduciary relationship is sufficient to shift the burden to the donee. *Kitsap Bank*, 177 Wn. App. at 571. Whether a legal fiduciary relationship exists is a question of law, which we review de novo. *Endicott*, 142 Wn. App. at 922.

McGill had both a confidential and fiduciary relationship with Horst. As discussed above, substantial evidence supports a finding of both a confidential and fiduciary relationship between McGill and Horst. Because McGill and Horst shared both a confidential and a fiduciary relationship, the first *Dean* factor is met.

The second *Dean* factor requires proof that the donee actively participated in the transaction. *Kitsap Bank*, 177 Wn. App. at 570-71. As discussed above, substantial evidence supports a finding that McGill actively participated in the transaction by drafting the deed, procuring the power of attorney, signing the REETA, driving Horst to the auditor's office, and obtaining a notary to notarize Horst's signature. Substantial evidence supports this factor.

The third *Dean* factor requires proof that the donee received an unusually large portion of the estate. *Kitsap Bank*, 177 Wn. App. at 570-71. As discussed above, substantial evidence does not support this factor.

In addition to the three factors, we also consider any other facts that point to the donor's vulnerability to undue influence due to "mental or physical infirmity and the nature of the relationship with the [donee]." *Barnes*, 185 Wn.2d at 14.

22

Here, as established by the findings of fact, Horst was over 90 years old, suffered from diminished mental capacity, suffered from memory loss, and was recovering from a coma and burn injuries. Horst trusted McGill and had lived with him for many years. At the time of the conveyance, Horst could not identify his family, could not identify the transaction, and did not know if McGill was family or not. McGill moved the transaction forward by preparing and filing all the required documents. McGill did not allow Horst to obtain the advice of legal counsel, nor did he inform Horst's family of the transaction. The findings show that McGill was uniquely positioned to influence Horst. These other considerations support the trial court's conclusion that a presumption of undue influence arose.

McGill argues that the first *Dean* factor requires more than mere existence of a fiduciary relationship. His arguments fail.

First, McGill argues that the fiduciary relationship must "exist in relation to the asset which is the subject of the undue influence claim." Br. of Appellant at 35. He supports his argument by relying on a single statement from *Bryant v. Bryant*, 125 Wn.2d 113, 118-19, 882 P.2d 169 (1994), where our Supreme Court held that an "agent becomes a fiduciary upon acquiring dominion and control over the principal's property." *Bryant*, 125 Wn.2d at 118 (citing *Moon v. Phipps*, 67 Wn.2d 948, 955, 411 P.2d 157 (1966)). However, the court in *Bryant* relied on that statement to explain the origin of the strict rule of construction applied to documents granting the power of attorney. *Bryant*, 125 Wn.2d at 118. *Bryant* relied on *Moon*, which discussed that when an agent exercises sufficient dominion and control over a principal's property, the agency relationship turns into a fiduciary relationship. *Moon*, 67 Wn.2d at 955. The rule is inapplicable here because the relationship between Horst and McGill was always a

fiduciary relationship because such a relationship is inherent between a principal and his attorney-in-fact—there is no requirement for McGill to exercise dominion and control over the property to have been Horst's fiduciary. *Barnes*, 185 Wn.2d at 12.

Next, McGill argues that to satisfy the first *Dean* factor, the attorney-in-fact must have used his power to benefit himself. His argument is unpersuasive.

McGill cites to *Barnes* and *In re Estate of Palmer*, 145 Wn. App. 249, 263, 187 P.3d 758 (2008), where the attorneys-in-fact effectuated a transaction beneficial to them. *Palmer*, 145 Wn. App. at 263-264; *Barnes*, 185 Wn.2d at 11. In *Palmer*, the daughter of an incapacitated adult used her power of attorney to transfer funds to her account. *Palmer*, 145 Wn. App at 253. In *Barnes*, the attorney-in-fact used her power of attorney to pay her mortgage from the incapacitated adult's funds. *Barnes*, 185 Wn.2d at 8.

Although both cases present facts showing that the attorneys-in-fact used their durable power of attorney to effectuate a transaction beneficial to them, neither court relied on that finding to support a conclusion that the first *Dean* factor was met. In fact, both *Palmer* and *Barnes* found that the first *Dean* factor was met because a fiduciary relationship existed as a matter of law. *Barnes*, 185 Wn.2d at 15; *Palmer*, 145 Wn. App. at 263. Neither court relied on the finding that the attorney-in-fact benefitted from the transaction.

Moreover, even if McGill's assertion was correct, his argument would still fail because the findings support a conclusion that McGill benefitted himself through the power of attorney. The findings clearly support a conclusion that McGill stood to benefit from the transaction which he procured—the conveyance granted McGill a 300-acre farm at no cost.

Therefore, the trial court's conclusion that the *Dean* factors were met is sufficiently supported by the findings, and the trial court correctly shifted the burden of proof to McGill.

C.      *No Rebuttal of the Presumption of Undue Influence*

If the presumption is raised, the burden of production shifts to the donee, who must rebut the presumption with evidence sufficient to "'balance the scales.'" *Barnes*, 185 Wn.2d at 15 (quoting *Dean*, 194 Wash. at 672). In making its determination, we "defer to the weight given to all the evidence by the trial court and its credibility assessment." *Barnes*, 185 Wn.2d at 16.

At trial, McGill relied on witness testimony claiming that Horst intended to gift McGill the property, and he attempted to introduce documentary evidence showing the farm's operating expenses. But the trial court found the witnesses not credible and excluded the documentary evidence based on lack of relevance. McGill did not introduce evidence at trial sufficient to rebut the presumption of undue influence; therefore, McGill maintained the burden of proving the absence of undue influence.

McGill argues that the trial court erred in excluding documentary evidence of the farm's operating expenses that would have shown the true size of the gift and that Horst did not continue to operate the farm as his own. The documentary evidence included five years of farm bills allegedly paid by McGill. "A party seeking review of a trial court's exclusion of evidence on relevance grounds must make an offer of proof at trial showing that the evidence at issue was relevant." *State v. Paul Bunyan Rifle & Sportsman's Club*, Inc., 132 Wn. App. 85, 95, 130 P.3d 414 (2006). "One of the purposes of such an offer is to inform the appellate court whether the appellant was prejudiced by the exclusion of the evidence." *Jankelson v. Cisel*, 3 Wn. App. 139, 143, 473 P.2d 202 (1970).

McGill's counsel questioned McGill about the farm's operating expenses. Garrison objected to the line of questioning on the basis of relevance, and McGill stated that evidence was relevant to show "the size of the gift." However, Garrison, explained:

> We've litigated back and forth for literally years about paying the power bills, and the Court well knows we've sold cattle to do that. The existing testimony establishes that's where the money came from.
>
> I guess I still struggle with the relevance. I mean, the size of the gift is the 300-acre farm that Mr. Horst quitclaimed, along with the tractors and the cattle and all the stuff that's already been testified to. I'm struggling to see the relevance of 80 pages of power bills.

VRP (Mar. 11, 2020) at 99-100. The court then asked McGill's counsel "you agree, this does not go to any sort of legal claim that's pled in this case?" VRP (Mar. 11, 2020) at 100. To which McGill's counsel responded "[c]orrect." VRP (Mar. 11, 2020) at 100. The trial court sustained the objection.

The trial court's exclusion of the power bills was not erroneous. Setting aside the fact that McGill's counsel agreed that the evidence was not relevant to any legal claim in this case, the operating expenses of the farm were irrelevant in rebutting the presumption of undue influence. As discussed, the relevant inquiry is the size of the farm in relation to Horst's entire estate, not the size of the farm in isolation. *Kitsap Bank*, 177 Wn. App. at 570-71. In other words, documents showing the expenses associated with operating the farm would not have rebutted a finding that the gift was unusually large. To do so, McGill would have needed to introduce evidence showing that the gift was not unusually large in comparison to the size of Horst's entire estate. We do not evaluate the size of the estate by looking at the size of the gift in isolation from the donor's other assets. Moreover, whether Horst operated the farm as his own is not sufficient to rebut the presumption of undue influence. *See e.g., Kitsap Bank*, 177 Wn. App.

at 570-71. Therefore, the evidence was not relevant and its exclusion did not prejudice McGill. The trial court properly excluded the documentary evidence.

McGill also argues that the trial court erroneously "refused to consider" testimony showing that Horst intended to gift McGill the farm. Br. of Appellant at 37. However, the trial court heard this evidence as testimony by McGill's witnesses but ultimately found the witnesses not credible. Because we cannot review the trial court's credibility determinations, we reject McGill's argument.

Thus, the trial court correctly concluded that McGill failed to rebut the presumption of undue influence.

D.       *Proving Undue Influence*

McGill argues that the trial court erred in concluding that he obtained Horst's property by exerting undue influence. We disagree.

Whether the presumption of undue influence is established or rebutted, the party contesting the gift bears the ultimate burden of proving that the gift was produced by undue influence by clear, cogent, and convincing evidence. *Barnes*, 185 Wn.2d at 16. Undue influence is influence that controls the [donor's] volition and prevents [him] from exercising [his] own judgment. *Barnes*, 185 Wn.2d at 10. Clear, cogent, and convincing evidence is evidence that makes the occurrence of a fact "highly probable." *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973). Evidence supporting a presumption could also be considered as evidence of actual undue influence. *Barnes*, 185 Wn.2d at 15. The determination of undue influence is a mixed question of fact and law. *Kitsap Bank*, 177 Wn. App. at 569.

Extensive evidence shows that McGill's actions amounted to undue influence sufficient to override Horst's free will. For example, McGill procured the power of attorney while Horst was still in the hospital. Evidence showed Horst had recently been in a coma and was suffering from breathing difficulties, memory loss, and loss in verbal communication. McGill then drafted the quit claim deeds transferring the entire farm to himself as a gift. He drove Horst for over an hour to notarize Horst's signature and to record on the deeds. McGill then gained control over Horst's personal and real property and sued Horst to maintain this control. This all occurred while Horst could not comprehend the transaction and did not have an opportunity to consult legal counsel or family. Thus, Garrison met her burden by clear, cogent, and convincing evidence.

The findings support the trial court's conclusion that Garrison met her burden of proof, and that McGill unduly influenced Horst.

## IV. FINANCIAL EXPLOITATION

McGill argues that the trial court erred when it concluded that McGill financially exploited Horst. We disagree.

RCW 74.34.020 defines financial exploitation as follows:

> (7) "Financial exploitation" means the illegal or improper use, control over, or withholding of the property, income, resources, or trust funds of the vulnerable adult by any person or entity for any person's or entity's profit or advantage other than for the vulnerable adult's profit or advantage. "Financial exploitation" includes, but is not limited to:
> (a) The use of deception, intimidation, or undue influence by a person or entity in a position of trust and confidence with a vulnerable adult to obtain or use the property, income, resources, or trust funds of the vulnerable adult for the benefit of a person or entity other than the vulnerable adult;
> (b) The breach of a fiduciary duty, including, but not limited to, the misuse of a power of attorney, trust, or a guardianship appointment, that results in the unauthorized appropriation, sale, or transfer of the property, income, resources, or

28

trust funds of the vulnerable adult for the benefit of a person or entity other than the vulnerable adult; or

      (c) Obtaining or using a vulnerable adult's property, income, resources, or trust funds without lawful authority, by a person or entity who knows or clearly should know that the vulnerable adult lacks the capacity to consent to the release or use of his or her property, income, resources, or trust funds.

The findings support that McGill financially exploited Horst in multiple ways. The parties do not dispute that Horst is a vulnerable adult. The determination turns on whether McGill's actions constituted financial exploitation under the statute. As discussed above, McGill unduly influenced Horst to gift him his property at no cost. McGill also exceeded his power as Horst's attorney-in-fact when he signed the REETA and indicated that it was a gift. McGill was also aware of Horst's advanced age and his condition after the fire. Yet, he obtained control over the property and transferred it to himself at no cost and without the presence or knowledge of Horst's family. Horst also lacked capacity to consent to the gifting of his property. Therefore, the facts support the conclusion that McGill financially exploited Horst.

## ATTORNEY FEES

Garrison requests attorney fees on appeal under RCW 11.96A.150 and RCW 74.34.130. Both these statutes allow for a discretionary award of reasonable attorney fees. We use our discretion to award Garrison reasonable attorney fees in an amount to be determined by a commissioner of this court.

## CONCLUSION

We hold that the trial court's germane findings were supported by substantial evidence and that those findings support the trial court's conclusions of law. Moreover, the trial court correctly found that a presumption of undue influence existed, McGill failed to produce evidence sufficient to rebut the presumption, and Garrison met her burden of proof by clear, cogent, and

29

No. 55001-6-II

convincing evidence.  Therefore, the trial court correctly found that McGill obtained Horst's

property as a result of undue influence, and that McGill financially exploited Horst.  Finally, we

award Garrison reasonable attorney fees on appeal.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered

Worswick, J.

We concur:

Maxa, J.

, C.J.

, C.J.