**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| BRYAN BRASWELL, an individual,<br><br>Appellant,<br><br>v.<br><br>THE ESTATE OF BETTY J. BURNS†;<br>and JOHN AND JANE DOES 1-10,<br>representing all other persons or<br>entities claiming any interest in the<br>property herein through defendant,<br><br>Respondents. | No. 87238-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — Bryan Braswell sued his mother Betty Burns in her individual capacity and as trustor and/or trustee, for a resulting trust, declaratory judgment, and to quiet title based on a dispute over ownership of an investment property in Seattle. Bryan appeals the trial court's findings, conclusions, and judgment against him.[1] He makes several arguments, including that the trial court erred in concluding that he breached his fiduciary duty of loyalty to Betty. We affirm.

---

† Betty Burns was originally named in her individual capacity and in her capacity as trustor and/or purported trustee of the Dingus House Trust, a revocable trust. Betty Burns passed away on July 12, 2025. We granted a motion to substitute the Estate of Betty J. Burns as the respondent.

[1] We refer to Bryan and his family members by their first name to avoid confusion only. No disrespect is intended.

I

This case concerns a family dispute between Bryan and his mother, Betty, over a Seattle investment property known as the Dingus house.[2] At the time of the relevant events, the family consisted of Betty, the family matriarch, and her three surviving adult children: Bryan, Rhonda Aflakian, and Robert Braswell. The family historically owned and invested in real property, some of which was used as rental property. Betty loaned money to Bryan and Robert on various occasions to help them buy real property or establish a business. Many of the loans were informal, with little to no documentation. Betty also sold or gifted some of the real estate she owned to Bryan at different times. Bryan routinely assisted Betty with the management and sale of her properties, and more recently with the purchase and remodel of her last residence before she moved into an assisted living facility in 2018.

On October 30, 2006, Bryan and his wife, Christe Braswell, entered an agreement to purchase the Dingus house for $375,000. But before the closing of the sale, Bryan and Christe decided against the purchase because Bryan already owned six houses, and adding the Dingus house to his portfolio would have classified him as a commercial borrower, subject to less favorable interest rates. Instead, Bryan asked Robert to purchase the Dingus house as his assignee. Robert agreed, and on October 29, 2007, they signed an agreement assigning all rights and interests in the Dingus house from Bryan and Christie to Robert. The sale closed on November 30, 2007.

---

[2] The following facts are taken from the trial court's amended findings of fact and conclusions of law and are largely undisputed by the parties. See State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003) (unchallenged findings of fact are verities on appeal); see also RAP 10.3(g). While Bryan disputes several of the trial court's findings, the findings are supported by substantial evidence. See Endicott v. Saul, 142 Wn. App. 899, 909, 176 P.3d 560 (2008).

Although Bryan testified that he did not receive any money from the closing of the Dingus house, the record shows that Bryan was repaid his contribution in full with a payment of $45,010.67.

While Robert owned the Dingus house, Bryan managed it. Bryan performed maintenance and repairs, procured and managed tenants, and ensured that mortgage and tax payments were made. Bryan retained all rents collected from tenants during that time, and also completed substantial remodeling to the Dingus house: he converted it from a single-family home into a duplex, physically lifted the house five feet to build and renovate a new lower floor, installed new water and sewer lines, installed concrete flooring and hydronic heating, built a new kitchen and bathroom, and added two bedrooms, totaling an additional 960 square feet to the property.

While part of the construction and remodeling was done during Robert's ownership of the house, Bryan confirmed that some of the work was not completed until 2012, after Betty purchased the Dingus house from Robert.

In early 2010, Robert wanted out of the mortgage obligation and title to the Dingus house so that he could qualify for a mortgage to purchase a different house. He offered to transfer title to the Dingus house to Bryan, provided that Bryan took over the mortgage. Bryan declined. During trial, Robert testified that Bryan told him to sell the Dingus house.

Robert then approached Betty about purchasing the Dingus house as an investment. She agreed, and on February 11, 2010, Robert and Betty signed an agreement for the sale. Bryan took no part in the sale process. Betty purchased the Dingus house for $375,000, the same price Robert had paid more than two years

before. She obtained a mortgage and wired $91,182.78 as a downpayment. The sale closed on March 29, 2010. Robert received $71,441.42 in sale proceeds, all of which he wired to Bryan on April 8, 2010, at Betty's request.

About that same time, Bryan approached Betty for a $70,000 loan he intended to use for a downpayment on a home in Arlington that he wished to buy as his personal residence. At Bryan's request, Robert and Bryan executed a "gift letter," attesting that the $71,441.42 payment described above was a gift from Robert to Bryan, rather than a loan from Betty to Bryan. The "gift letter" was executed so Bryan could circumvent the mortgage lender's requirement that the downpayment on the Arlington residence not come from borrowed funds. The representations in the "gift letter" were misleading, since the $71,441.42 payment was in fact a loan from Betty to Bryan coming out of the Dingus house sale proceeds.

On April 1, 2010, Betty, as owner, and Bryan, as agent, entered into a Property Management Agreement (PMA) for the Dingus house. Under the PMA, Bryan was entitled to lease the premises, collect rent, maintain the property, and initiate legal actions related to rent collection or eviction. Bryan was also authorized to pay himself a management fee and to reimburse himself from the rent payments collected. Betty's duties under the PMA included covering expenses related to the tenants, maintenance, legal proceedings, and to "reimburse Agent promptly for any moneys that Agent may elect to advance for the account of the Owner." Bryan never sought payment or reimbursement from Betty under the PMA.

Betty's personal bank account was used for the collection of rent and mortgage payments and, beginning in 2015, Betty's Chase Bank savings account became the

-4-

Dingus house operating account. Bryan was added and given access to the Chase account so that he could take care of the maintenance of the Dingus house. The PMA remained unchanged from 2010 to 2018.

Sometime in 2018, Bryan became concerned about Betty's memory and her estate planning for the Dingus house. Bryan wanted the Dingus house to pass on to his daughter, Lauren Braswell, and approached Betty to discuss transferring the property into a trust for Lauren's benefit.

On November 9, 2018, Betty established the Betty J. Burns Revocable Living Trust (Burns Trust), designating Robert as trustee. The Burns Trust included a provision for the distribution of the Dingus house to Lauren when Lauren reached 30, or her issue, upon Betty's passing, with Bryan, Robert, and Rhonda as the contingent remainder beneficiaries. The trust was funded, but the Dingus house was never transferred into the trust.

The Burns Trust was unacceptable to Bryan both because it named Robert as trustee, and because it provided for Robert and Rhonda to be contingent remainder beneficiaries of the Dingus house. Bryan demanded that Betty create a second revocable living trust.

On December 31, 2018, Betty created a second revokable living trust called the Dingas House Trust, designating Bryan as the trustee. The trust provided that if Lauren predeceased Betty and had no issue, the Dingus house was to be distributed equally between Bryan, Robert, and Rhonda. This iteration of the trust was also unacceptable to Bryan, because Bryan wanted only himself and his wife to be the contingent

remainder beneficiaries if Lauren predeceased Betty without issue. The Dingus house was never transferred into the Dingas House Trust.

On March 14, 2019, Betty created a third revocable living trust called the Dingus House Trust. The trust designated Bryan as trustee and provided for income and principal distributions to Betty at her request, and to Lauren on a discretionary basis. The trust provided for distribution of the Dingus house to Lauren when she turned 30 and/or to her issue, and if Lauren predeceased Betty without issue, then the Dingus house would be transferred to Bryan exclusively. In addition, Article 3 of the Dingus House Trust reserved Betty, as trustor, the right to amend the trust, revoke it, withdraw assets from it, and to change the trustee.

After the Dingus House Trust was created, Bryan became concerned "that the trust document was not as bulletproof as [Betty]'s attorney had said it was." In March 2020, Bryan e-mailed Betty's estate planning attorney, Philip Janney, demanding that Betty make the Dingus House Trust irrevocable. Bryan then spoke with Betty, and she agreed to change the trust as long as Bryan repaid money he had borrowed from her. Bryan did not pay any new consideration to Betty for changing the nature of the trust.

Although Bryan repaid Betty the money he had borrowed from her, it became clear that making the Dingus House Trust irrevocable would not be possible as long as Betty was still liable for the mortgage. Janney informed Bryan that changing the nature of the Dingus House Trust would trigger a "due on sale" clause in the mortgage. Janney recommended that either Bryan or Robert approach the lender to see whether the "due on sale" clause could be waived. Besides unsuccessfully phoning the lender, nothing in the record reveals that Bryan took any other actions to resolve this issue.

-6-

In July 2022, Betty decided to revoke the Dingus House Trust and transfer title to the Dingus house back to herself. On July 21, 2022, Betty's new attorney, Michael Jacobs, sent written notice to Bryan of her intent to terminate the Dingus House Trust, requesting a ledger of the operating account covering 2018 through 2023, and directing Bryan to transfer the Dingus house back to Betty, in accordance with the provisions of the instrument. Bryan did not comply with Betty's requests.

Instead, on October 11, 2022, Bryan sued Betty in her individual capacity and as trustor and/or trustee of the Dingus House Trust. The complaint raised three causes of action: resulting trust, quiet title, and declaratory judgment. That same day, Bryan recorded a lis pendens against the Dingus house. Betty answered with counterclaims and affirmative defenses on February 27, 2023.

On July 12, 2023, Betty's counsel successfully petitioned the trial court for the appointment of a guardian ad litem (GAL). Attorney Karl Hausmann was appointed as Betty's GAL on July 31, 2023.

On June 14, 2024, the trial court heard the parties' cross-motions for summary judgment. The trial court granted Betty's motion for summary judgment to dismiss Bryan's claims of resulting trust and to quiet title, reserving for trial only the issue of declaratory judgment. The trial court added that it would not preclude Bryan from asserting his claims to an equitable interest in the Dingus house.

After a three-day bench trial, the trial court entered its amended findings of fact and conclusions of law on September 3, 2024. The trial court found that, "[g]enerally speaking, [Bryan's testimony] was less than fully credible." "His testimony was

contradicted in several respects by records and documents."  The trial court ultimately dismissed Bryan's claims for equitable relief and quieted title to Betty.

The trial court reserved ruling on the amount of attorney fees, costs, and GAL fees to be awarded to Betty, and the amount of Bryan's management fees under the PMA that would be deducted from Betty's final award.  The trial court also found that Bryan withdrew funds from the Chase Bank account to pay for his own legal expenses.  These withdrawals were not authorized under either the Dingus House Trust or the PMA.

On February 18, 2025, the trial court entered judgment and awarded attorney fees, costs, and GAL fees to Betty.

Bryan appeals.

II

Bryan first argues that nine of the trial court's findings of fact are unsupported by substantial evidence.  We disagree.

A

After a bench trial, we review the trial court's decisions to determine whether its findings of fact are supported by substantial evidence.  Endicott v. Saul, 142 Wn. App. 899, 909, 176 P.3d 560 (2008).  Substantial evidence is evidence sufficient to persuade a rational, fair-minded person of the asserted premise.  State v. Homan, 181 Wn.2d 102, 106, 330 P.3d 182 (2014), abrogated on other grounds by State v. Roberts, 5 Wn.3d 222, 572 P.3d 1191 (2025).  We do not weigh evidence, find facts, or substitute our opinions for those of the trier of fact.  Quinn v. Cherry Lane Auto Plaza, Inc., 153 Wn. App. 710, 717, 225 P.3d 266 (2009).  Additionally, all reasonable inferences from

the findings are viewed in the light most favorable to the prevailing party below.  Jensen v. Lake Jane Ests., 165 Wn. App. 100, 104, 267 P.3d 435 (2011).

B

In finding of fact (FOF) 1.9, the trial court found that "Bryan testified that he did not receive any money out of the closing.  However, Exhibits 107 and 157 show that Bryan was repaid his monetary contribution toward the property in full from escrow when the sale to Robert Braswell closed, resulting in a payment to Bryan totaling $45,010.67."  Bryan argues that the trial court ignored evidence that the entirety of the $45,010.67 was credited toward Robert's nominal purchase, including a payoff statement.  The Estate responds that Bryan relies on a payoff statement that was superseded by a payoff statement dated a month later, and that this was confirmed by a statement by the seller of the Dingus House, Dawn Dingus.  We agree with the Estate.

The trial court relied on the second payoff statement, dated a month later, to find that Bryan had been repaid his monetary contribution toward the Dingus house.  Indeed, during his testimony, Bryan admitted that the payees for the $45,010.67 non-negotiable November 30, 2007, check from Dawn Dingus were himself and his wife.  Thus, making all reasonable inferences in favor of the Estate, we conclude that FOF 1.9 is supported by substantial evidence.

In FOF 1.27 and 1.60, the trial court found that "[n]o evidence was presented to document that Bryan[] contributed any of his own personal funds to the Chase Bank operating account or to the maintenance of the [Dingus House] during Betty['s] ownership," and that "[w]hile the Court has no doubt that [Bryan] invested considerable time, labor, and at least some amount of money into maintaining and remodeling the

Dingus House[], quantifying the monetary value of this work is difficult to impossible." Bryan asserts that the court ignored photographs and personal bank statements that reflected the nature and cost of materials and supplies he purchased. The Estate replies that, apart from personal bank statements that were admitted only for illustrative purposes, Bryan presented no documents demonstrating that his personal funds went toward improvements of the Dingus house. We agree with the Estate.

The trial court determined that exhibits 7 and 8 could be admitted for illustrative purposes only; they contained credit statements and some notes in Bryan's handwriting which were difficult to read, and which Bryan himself admitted he was "not 100%" certain that they reflected his expenses connected to the Dingus house. Exhibits 70 and 71 contained photographs of the Dingus house taken by Bryan two weeks before the bench trial and sometime in 2012, respectively. Making all reasonable inferences in favor of the Estate, we conclude that FOF 1.27 and 1.60 are supported by substantial evidence.

In FOF 1.32, the trial court found that after reviewing the terms of the first iteration of the trust, the Burns Trust, "Bryan demanded that Betty create a second revocable living trust." Bryan argues that he did not know about the Burns Trust until after the underlying lawsuit was filed, and that the Estate attempts to confuse his testimony about the Dingas Trust with discussions about the other two iterations of the trust. In contrast, the Estate contends that Bryan and Robert's testimony, as well as unchallenged FOF 1.28 and 1.30, support the trial court's findings. We agree with the Estate, with a caveat.

During cross-examination, Betty's trial counsel asked Bryan specifically about the Dingas Trust, not the Burns Trust. Thus, insofar as the Estate relies on that portion of Bryan's testimony to support FOF 1.32, the Estate is mistaken. Still, during his cross-examination, Robert did refer to the Burns Trust specifically and testified that he believed the Burns Trust was shared with Bryan, given that "he had a number of amendments that he wanted to make to it." The amendments, Robert stated, related to who the beneficiaries of the Burns Trust would be if Lauren predeceased Betty without issue.

In addition, in FOF 1.28 and 1.30 the trial court found that Bryan grew concerned about Betty's memory declining and how that would affect her estate planning, and that he wanted to ensure that the Dingus house passed on to Lauren, which is why he approached Betty in 2018 to discuss transferring the Dingus House into a trust for Lauren's benefit. These findings are unchallenged by Bryan and are verities on appeal. See State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003); RAP 10.3(g).

Therefore, although in the portion of Bryan's testimony highlighted by the Estate he was discussing the Dingas Trust, Robert's testimony and unchallenged FOF 1.28 and 1.30 referred to the Burns Trust either directly or generally. Based on that and making all reasonable inferences in favor of the Estate, we conclude that FOF 1.32 is supported by substantial evidence.

Lastly, in FOF 1.41, 1.42, 1.51, and 1.59(v) the trial court found that (1) throughout Betty's ownership of the Dingus house, and after it was transferred into the Dingus House Trust, Bryan made significant and repeated withdrawals from the Chase Bank account; (2) no evidence supported Bryan's testimony that the cash withdrawals

went to Lauren; (3) no evidence supported the notion that the cash withdrawals Bryan made went to the maintenance of the Dingus house; (4) ATM withdrawals in connection to the Chase Bank account occurred near Bryan's residence and many of them can be traced to deposits into Bryan's personal bank account, totaling $86,500; (5) in connection to the underlying suit, Bryan withdrew funds from the Chase Bank account to pay for his own legal expenses, which was not authorized under the Dingus House Trust nor the PMA; and (6) Bryan generally treated the Chase Bank account as his own.

Bryan asserts that those findings suggest that the trial court was all too impressed by Betty's trial counsel highlighting certain transactions during Bryan's cross-examination and denies any improper withdrawals. In opposition, the Estate argues that it was precisely the duty of the trial court to determine the persuasiveness of the evidence, that Bryan could not explain the highlighted transactions, and that the Estate is not required to prove that every single one of Bryan's withdrawals from the Chase Bank account was improper. We agree with the Estate.

In its brief, the Estate correctly points out that it is the purview of the trial court to determine the persuasiveness of the evidence. See Endicott, 142 Wn. App. at 909. And making all reasonable inferences in favor of the Estate, we conclude that FOF 1.14, 1.42, 1.51, and 1.59(v) are supported by substantial evidence.[3]

---

[3] Bryan also challenges FOF 1.58 and 1.59, broadly. In doing so, Bryan once again questions the way the trial court determined the persuasiveness of the evidence, calling its findings "conclusory and opinionated." But as we already explained, it is precisely the purview of the trial court to determine the persuasiveness of the evidence. See Endicott, 142 Wn. App. at 909. Thus, making all reasonable inferences in favor of the Estate, we conclude that FOF 1.58 and 1.59, broadly, are supported by substantial evidence.

III

Bryan next argues that the trial court erroneously applied a presumption of undue influence and inverted the applicable burden of proof. We disagree.

A

Conclusions about undue influence present mixed questions of law and fact. In re Trust & Est. of Melter, 167 Wn. App. 285, 301, 273 P.3d 991 (2012). The evidence to establish fraud or undue influence must be clear, cogent, and convincing. Dean v. Jordan, 194 Wash. 661, 671, 79 P.2d 331 (1938). That said, certain facts and circumstances may give rise to a rebuttable presumption of undue influence. At a minimum, the following factors must be present: (1) a fiduciary or confidential relationship, (2) active participation in preparing the document, and (3) an unusually or unnaturally large gift or bequest. Dean, 194 Wash. at 671-72; In re Est. of Kolesar, 27 Wn. App. 2d 166, 181, 532 P.3d 170 (2023); see also Melter, 167 Wn. App. at 296 (holding that "if the recipient [of an inter vivos gift] has a confidential or fiduciary relationship with the donor . . . the burden of persuasion shifts to the donee to prove that the gift was intended and not the result of undue influence."); Kitsap Bank v. Denley, 177 Wn. App. 559, 570-71, 312 P.3d 711 (2013) (explaining that additional factors such as age, mental health, and the opportunity for exerting undue influence should also be considered).

B

The trial court made the following findings which Bryan does not dispute: (1) Betty moved into an assisted living facility in 2018; (2) Bryan approached Betty in 2018 about transferring the Dingus house into a trust for Lauren's benefit; (3) Bryan found two

early iterations of the Dingus House Trust unacceptable because they provided for Bryan's siblings, Robert and Rhonda, to be contingent remainder beneficiaries of the trust; (4) Bryan wanted only himself and his wife to be the contingent beneficiaries of the trust; and (5) the Dingus House Trust ultimately designated Bryan as trustee and as the exclusive contingent remainder beneficiary.

On the first undue influence factor—fiduciary or confidential relationship—as her son, Betty trusted Bryan to assist her with her estate planning, particularly with respect to the Dingus house. In addition, by being designated trustee under the Dingus House Trust, Bryan was by definition in a fiduciary relationship with Betty, who was the trustor. Bryan was in a confidential and fiduciary relationship with Betty.

On the second factor—active participation in the agreement—beyond the confidential and fiduciary relationship, Bryan actively participated in the creation of the Dingus House Trust. Indeed, one of the main reasons why there are three iterations of a trust concerning the Dingus House is because Bryan found the provision dealing with contingent beneficiaries in the two early iterations unacceptable. Bryan confirmed during his cross-examination that some of the changes were made because that is what he wanted. Bryan also testified that he went as far as to tell Robert at one point that there was "no blanking way you or Rhonda are getting your hands on [the Dingus house]." Bryan was an active participant in the creation of the Dingus House Trust.

On the third factor—unusually large gift or bequest—the focal point of our analysis is the Dingus House Trust, not the entirety of Betty's estate. Bryan did not stand to receive just an unusually large portion of the Dingus House Trust, but potentially its entirety. The Dingus House Trust designated him as trustee and provided

for income distributions to Lauren, as per his wishes. It also provided for the distribution of the Dingus house to Lauren upon her 30th birthday, and if Lauren predeceased Betty without issue, then the Dingus house was to be distributed to Bryan alone. Bryan stood to gain an unusually large portion of the Dingus House Trust.

All three necessary factors for a rebuttable presumption of undue influence are met. We also consider that Betty was 90 years old and resided in the memory care unit of an assisted living facility at the time the relevant events took place. Bryan failed to rebut the presumption and seriously impaired Betty's "free and competent exercise of judgment." In re Est. of Jones, 170 Wn. App. 594, 606, 287 P.3d 610 (2012).

For those reasons, we conclude that the Estate presented clear, cogent, and convincing evidence that Bryan exerted undue influence over Betty.[4]

IV

Bryan next argues that his conduct, including his use of the Chase Bank account funds, did not amount to a breach of fiduciary duty. He contends that the trial court did not consider whether Betty proved he used Chase Bank account funds for his own benefit, and asserts that any funds withdrawn were paid to Lauren. Thus, he concludes, those distributions did not harm Betty, let alone amount to a breach of fiduciary duty. We disagree.

---

[4] Bryan also argues that the trial court erred by failing to consider whether all the elements for a claim of financial exploitation we set forth in Kolesar are present, and by relying on an erroneous presumption of undue influence instead. But as we already explained, the trial court's application of a rebuttable presumption of undue influence was proper and Bryan failed to prove by clear, cogent, and convincing evidence that he did not obtain and use Betty's and the Dingus House Trust's property, income, and resources and apply them for his own profit or advantage. See RCW 74.34.020(7).

-15-

A

"[A] trustee is a fiduciary who owes the highest degree of good faith, diligence and undivided loyalty to the beneficiaries." In re Est. of Ehlers, 80 Wn. App. 751, 757, 911 P.2d 1017 (1996). The duties of a trustee "are determined by the terms of the trust, by common law and by statute." Ehlers, 80 Wn. App at 757. A breach of fiduciary duty is a common law cause of action, with clearly established elements. See 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 107.10 (7th ed. 2019) (WPI).

To prevail on a breach of fiduciary duty claim, the plaintiff must show "(1) the existence of a duty; (2) a breach of that duty; (3) a resulting injury; and (4) that the claimed breach was the proximate cause of the injury." Miller v. U.S. Bank of Wash., N.A., 72 Wn. App. 416, 426, 865 P.2d 536 (1994).

B

On the first element, the Dingus House Trust was a revocable living trust that named Bryan as trustee. As such, Bryan owed fiduciary duties to the beneficiaries under the instrument. Article 4, section A of the trust established two beneficiaries, Lauren and Betty. Bryan conceded this during his trial testimony. Bryan owed fiduciary duties of "good faith, diligence, and undivided loyalty" to both Lauren and Betty. Ehlers, 80 Wn. App. at 757.

On the second element, the Washington Trust Act sets out a trustee's duty of loyalty: a "trustee must administer the trust solely in the interests of the beneficiaries." RCW 11.98.078(1). As discussed earlier, Bryan failed to account for trust funds, repeatedly made ATM withdrawals from the Chase Bank account and deposited the money into his personal bank account, failed to follow Betty's instruction to transfer the

Dingus house out of trust, and used trust funds to pay for his own legal expenses in the underlying suit. Bryan breached his duty to administer the Dingus House Trust funds solely in the interest of Lauren and Betty.

On the third element, it is undisputed by the parties that Betty incurred significant attorney fees and costs, including GAL fees, in defending the underlying suit. Bryan also recorded a lis pendens against the Dingus House after Betty notified him of her intent to revoke the Dingus House Trust and instructed him to transfer the Dingus house out of trust and back to her. Bryan's actions caused injury to Betty.

Lastly, on the fourth element, it was foreseeable that in defending the underlying suit, Betty would have to expend considerable money on attorney fees and costs. Further, given that when the underlying suit was filed in 2022 when Betty was 90 years old, and that Bryan showed concern for her memory as early as 2018, it was also foreseeable that she would have to expend money procuring a GAL to defend the suit. And finally, the harm caused by Bryan's repeated ATM withdrawals from the Chase Bank account and by using trust funds to pay for his own legal expenses in the suit he filed against Betty in the first place, was amply foreseeable. Bryan's breach of his duty of undivided loyalty was the proximate cause of Betty's harm.

Because all four elements are met, we conclude that Bryan breached his fiduciary duty of undivided loyalty to Betty.[5]

---

[5] Bryan argues that both litigation privilege and the Noerr-Pennington doctrine should have immunized him from Betty's claim of breach of fiduciary duty. E. R. R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961). The Estate responds that both claims are waived because Bryan did not raise them below. We agree with the Estate. In general, issues not raised in the trial court may not be raised on appeal. Roberson v. Perez, 156 Wn.2d 33, 39, 123 P.3d 844 (2005); RAP 2.5(a).

V

Bryan next argues that the trial court erred in concluding that he was unjustly enriched by the withdrawals he made from the Chase Bank account. He relies only on the assertion that he did not breach any duty owed to Betty. We disagree.

"Unjust enrichment occurs when one retains money or benefits which in justice and equity belong to another." Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc., 61 Wn. App. 151, 160, 810 P.2d 12 (1991). A plaintiff alleging unjust enrichment must show three elements: (1) a benefit conferred upon the defendant by the plaintiff, (2) knowledge by the defendant of the benefit, and (3) acceptance of the benefit by the defendant under such circumstances that make it inequitable for the defendant to retain the benefit. Young v. Young, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008).

It is undisputed by the parties that under the PMA, and as trustee under the Dingus House Trust, Bryan had access to the Chase Bank account so that he could take care of the maintenance of the Dingus house. Bryan was aware of this, and, as discussed above, he breached his fiduciary duty of undivided loyalty to Betty. Based on that, we conclude that Bryan "retain[ed] money [and] benefits which in justice and equity belong[ed] to Betty." Bailie, 61 Wn. App. at 160.

VI

Bryan also makes several requests for equitable relief including an equitable lien, a constructive trust, an implied partnership, and detrimental reliance. The Estate responds that Bryan's misconduct bars equitable relief under the doctrine of "unclean hands." We agree with the Estate.

"It is well settled that a party with unclean hands cannot recover in equity." Miller v. Paul M. Wolff Co., 178 Wn. App. 957, 965, 316 P.3d 1113 (2014). We review a trial court's determination on whether a party comes to court with unclean hands for an abuse of discretion. Burt v. Dep't of Corr., 191 Wn. App. 194, 199, 361 P.3d 283 (2015)). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

As explained above, the trial court correctly concluded that Bryan breached his fiduciary duty of undivided loyalty to Betty. Based on that, the trial court did not abuse its discretion when it determined that Bryan had "unclean hands." See State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). Bryan is barred from recovering in equity.

VII

Lastly, Bryan argues that the trial court fundamentally misapprehended the equities in the case, and that they do not support an award of attorney fees, costs, and GAL fees to the Estate. Rather, he contends, he should be awarded attorney fees and costs. We disagree.

Whether a party is entitled to attorney fees is an issue of law that we review de novo. Little v. King, 147 Wn. App. 883, 890, 198 P.3d 525 (2008). And whether the fee award is reasonable is reviewed for an abuse of discretion. Bloor v. Fritz, 143 Wn. App. 718, 747, 180 P.3d 805 (2008).

The parties do not dispute that the underlying action falls under the Trust and Estate Dispute Resolution Act (TEDRA), ch. 11.96A RCW. RCW 11.96A.150 addresses an award of attorney fees, costs, and GAL fees:

> (1) Either the superior court or any court on an appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party: (a) From any party to the proceedings; (b) from the assets of the estate or trust involved in the proceedings; or (c) from any nonprobate asset that is the subject of the proceedings.  The court may order the costs, including reasonable attorneys' fees, to be paid in such amount and in such manner as the court determines to be equitable.  In exercising its discretion under this section, the court may consider any and all factors that it deems to be relevant and appropriate, which factors may but need not include whether the litigation benefits the estate or trust involved.
>
> (2) This section applies to all proceedings governed by this title, including but not limited to proceedings involving trusts, decedent's estates and properties, and guardianship matters.  This section shall not be construed as being limited by any other specific statutory provision providing for the payment of costs, including RCW 11.68.070 and 11.24.050, unless such statute specifically provides otherwise.  This section shall apply to matters involving guardians and guardians ad litem.

The subject matter of the underlying suit falls squarely under the broad definition of "matter" under RCW 11.96A.030(2).  Thus, the trial court was well within its discretion to order an award of attorney fees and costs to the Estate.  And RCW 11.96A.150(2) confirms that the costs and attorney fee provision applies to matters involving guardians and GALs.  The trial court did not err in awarding Betty her attorney fees, costs, and GAL fees under TEDRA.

The trial court also awarded the Estate actual damages related to the lis pendens Bryan recorded against the Dingus house.  RCW 4.28.328(3) provides that:

> Unless the claimant establishes a substantial justification for filing the lis pendens, a claimant is liable to an aggrieved party in defense of the action in which the lis pendens was filed for actual damages caused by filing the lis pendens, and in the court's discretion, reasonable attorneys' fees and costs incurred in defending the action.

As discussed earlier, upon getting notice from Betty about her intention to revoke the Dingus House Trust and being instructed to take the Dingus house out of trust,

-20-

Bryan recorded a lis pendens against the property. Given that his claims for ownership through resulting trust and quiet title were dismissed at summary judgment, there was no substantial justification for recording a lis pendens. The trial court did not err in awarding the Estate actual damages caused by the lis pendens recorded by Bryan.

The Estate also seeks attorney fees and costs on appeal. RCW 11.96A.150 grants discretion to award attorney fees and costs in "all proceedings governed by this title." This includes costs and attorney fees on appeal. See In re Est. of Boatman, 17 Wn. App. 2d 418, 435, 488 P.3d 845 (2021). Upon compliance with RAP 18.1, we award the Estate its reasonable attorney fees and costs on appeal.

We affirm.

_____ Mann, J.

WE CONCUR:

_____ Díaz, J.

_____, ACJ